**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

DEBORAH PIAZZA,

      Plaintiff,

vs.                                                                 No. CIV 24-0051 JB/SCY

HK HOSPITALITY, LLC
d/b/a Quality Inn Tucumcari,
and AMAN PATEL,

      Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Plaintiff's Motion for Entry of Damages Judgment, filed January 28, 2026 (Doc. 81)("Motion"). The Court holds a hearing on the Motion on March 20, 2026. See Clerks Minutes at 1 (Doc. 95); Draft Hearing Transcript of Proceedings at 1 (taken March 20, 2026)(Court)("2026 Tr.").[1] The primary issues before the Court are: (i) whether the Court should award Plaintiff Deborah Piazza unpaid overtime wages in the amount of $241,997.70, where Piazza simultaneously seeks damages for unpaid minimum wages during the same period; (ii) whether the Court should award Piazza unpaid minimum wages in the amount of $56,823.03, where Piazza simultaneously seeks damages for unpaid overtime wages during the same period; (iii) whether the Court should award Piazza continuation wages for late payment of final wages in the amount of $1,186.80, where Defendants HK Hospitality, LLC, and Aman Patel terminate Piazza's employment on December 6, 2023, and they do not pay her final wages until December 28, 2023; (iv) whether the Court should award Piazza ten-percent prejudgment interest on all money judgments that the Court enters pursuant to New Mexico Law, where Piazza does

---

[1] The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

not accept a settlement offer that  Defendants HK Hospitality, LLC[2] and Aman Patel make; and

(v) whether the Court should award Piazza fifteen-percent post-judgment interest from the date of

entry of judgment pursuant to N.M. Stat. Ann. § 56-8-4 (1978), where the Court does not make a

specific finding that the Defendants act in bad faith, intentionally, or willfully in violation of

federal and New Mexico labor laws.  The Court concludes that it: (i) awards Piazza unpaid

overtime wages in the amount of $241,997.70, where Piazza simultaneously seeks damages for

unpaid minimum wages during the same period, because the New Mexico Minimum Wage Act

("NMMWA") holds employers liable "in the amount of their unpaid or under paid wages," whereas

Piazza's calculations attempt to hold the Defendants liable for both the unpaid and under paid

amounts; (ii) does not award Piazza unpaid minimum wages in the amount of $56,823.03, where

Piazza simultaneously seeks damages for unpaid overtime wages during the same period, because

the NMMWA holds employers liable "in the amount of their unpaid or under paid wages," whereas

Piazza's calculations attempt to hold the Defendants liable for both the unpaid and under paid

amounts; (iii) awards Piazza continuation wages for late payment of final wages in the amount of

$1,186.80, because N.M. Stat. An. § 50-4-4(B) requires employers to pay discharged employees

payment of wages or compensation within ten days of such discharge; (iv) awards seven-percent

prejudgment interest on all money judgments the Court enters, where Piazza does not accept a

settlement offer from the Defendants, because the Defendants' make one settlement offer,

conditioning it upon the forfeiture of her state law claims, without another offer during the two

---

[2] HK Hospitality, LLC, d/b/a Quality Inn Turcumcari is a New Mexico limited liability company with the following principal members and their citizenship: Karmesh Patel (registered agent), Tucumcari, NM 88401; Haresh Patel, Lincoln Park, MI 48146; and Kirit Patel, Houston, TX 77092.  Deborah Piazza is a New Mexico resident.  See Complaint Jury Demand ¶ 1, at 1, filed January 15, 2024 (Doc. 1).  Accordingly, the Court has federal question subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction pursuant to 29 U.S.C. § 201.

years of litigation, and Piazza does not delay the proceedings; and (v) awards Piazza fifteen-percent post-judgment interest from the date of entry of judgment pursuant to N.M. Stat. Ann. § 56-8-4, where the Court does not make a specific finding that the Defendants act in bad faith, intentionally, or willfully in violation of federal and New Mexico labor laws, because the Defendants knowingly classify Piazza as exempt despite not providing her the minimum statutory salary to classify as exempt and because they retaliate against Piazza for her employment claims, making the Defendants' bad faith conduct willful and intentional. Accordingly, the Court grants in part and denies in part the Motion.

## FACTUAL BACKGROUND

The Court begins the Factual Background with a quick procedural note. On November 13, 2025, the Court grants Piazza's partial motion for summary judgment. See Order Granting Plaintiff's Motion for Partial Summary Judgment at 1-4 (Doc. 59)("MSJ Order"). In the MSJ Order, the Court deems the facts in the Plaintiff's Motion for Partial Summary Judgment and Memorandum in Support, filed September 18, 2025 (Doc. 41)("MSJ Motion"), admitted and uncontroverted pursuant to rule 56(e) of the Federal Rules of Civil Procedure and rule 56.1(b) of the local rules. See MSJ Order ¶ 1, at 1 (citing Fed. R. Civ. P. 56(e) and D.N.M. LR-Civ 56.1(b)). Accordingly, the Court recites the following non-exhaustive facts from the MSJ Motion for purposes of deciding the Motion.

### 1.    The Defendants' Hotel Operations and Piazza's Interstate Work.

HK Hospitality and Patel own and operate the Quality Inn, a hotel in Tucumcari, New Mexico. See MSJ Motion ¶ 1, at 2. The Quality Inn operates as part of a national franchise system that serves travelers from multiple states. See MSJ Motion ¶ 2, at 2. Piazza personally engages in interstate activities in her role as General Manager. See MSJ Motion ¶ 4, at 2-3. Her daily

duties include processing credit card transactions, handling reservations for out-of-state guests, communicating with franchise representatives located outside New Mexico, and ordering supplies. See MSJ Motion ¶ 4, at 3.  Piazza also reviews financial documents including profit-and-loss statements, daily revenue printouts, and monthly roll-up reports for Defendants' hotels.  See MSJ Motion ¶ 5, at 3.  These reports show that the Defendants' hotel operations generate annual revenues well above "$500,000 during her tenure."  MSJ Motion ¶ 5, at 2.

### 2. Piazza's Employment History and Duties.

The Defendants employ Piazza from December 31, 2019, until November 7, 2021, and from November 21, 2021, until her December 6, 2023, termination.  MSJ Motion ¶ 7, at 3.  From December 31, 2019, through November 7, 2021, Piazza serves as Regional Manager overseeing both the Quality Inn in Tucumcari, and the Motel 6 in San Angelo, Texas.  See MSJ Motion ¶ 8, at 3-4.  On November 21, 2021, the Defendants reassign Piazza to the on-site General Manager role at the Tucumcari property.  See MSJ Motion ¶ 9, at 4.  Her responsibilities include supervising staff, reviewing payroll, ensuring franchise compliance, and addressing guest needs at all hours. See MSJ Motion ¶ 9, at 4.  On August 14, 2023, the Defendants issue Piazza a written Employment Offer Letter confirming her role as General Manager of the Tucumcari hotel and raising her annual salary to $36,000.00.  See MSJ Motion ¶ 10, at 4.

### 3. The Defendants' Pay Practices and Misclassification.

The Defendants pay Piazza on a salary basis and classify her as exempt from overtime. See MSJ Motion ¶ 13, at 4.  From November 21, 2021, through April 10, 2022, the Defendants pay Piazza an annual salary of $31,616.00, or $608.00 per week. See MSJ Motion ¶ 14, at 5.  On April 11, 2022, the Defendants increase Piazza's salary to $34,000.00 annually, or $653.85 per week, and pay her that amount through August 13, 2023.  See MSJ Motion ¶ 15, at 5.  On August

14, 2023, the Defendants raise Piazza's salary to $36,000.00 annually, or $692.31 per week.  See MSJ Motion ¶ 16, at 5.  Piazza's salary bears no relationship to the hours she works.  See MSJ Motion ¶ 17, at 5.  Throughout her employment, she works seven days a week and averages approximately seventy-one hours per week.  See MSJ Motion ¶ 17, at 5.  Except for a $250.00 bonus on December 20, 2021, and a $500.00 bonus on April 12, 2022, the Defendants do not pay Piazza any wages beyond her salary, regardless of how many hours she works.  See MSJ Motion ¶ 19, at 5.  Piazza consistently works well over forty hours per week, yet the Defendants do not pay her overtime premiums. See MSJ Motion ¶ 20, at 5-6.

### 4.      **The Department of Labor Investigation and Findings.**

In 2023, the United States Department of Labor ("DOL") investigates the Defendants' pay practices covering November 7, 2021, through August 27, 2023.  MSJ Motion ¶ 21, at 6.  Piazza cooperates fully with the investigation by sitting for interviews with investigators and producing payroll and schedule records.  See MSJ Motion ¶ 22, at 6.  The DOL determines that the Defendants owe Piazza $9,815.38 in Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. § 201, back wages and liquidated damages.  See MSJ Motion ¶ 23, at 6.

### 5.      **Pre-Termination Wage Dispute Events.**

Before the DOL discloses its findings, HK Hospitality manager Jaya Merchant, acting at Patel's direction, offers Piazza $600.00 to settle her claims and represents to her that amount is all that the Defendants can afford to pay.  See MSJ Motion ¶ 24, at 6.  On November 21, 2023, at the DOL's direction, the Defendants tender Piazza a $9,815.38 check representing back wages and liquidated damages, and on December 14, 2023, the DOL issues a WH-60[3] letter memorializing

---

[3] The WH-60 is the DOL's Back Wage Claim Form.  See U.S. Department of Labor, Works Owed Wages, https://www.dol.gov/agencies/whd/wow (last visited May 23, 2026).

its investigation and confirming that amount.  See MSJ Motion ¶ 26, at 5.  Neither the DOL letter

nor the check require Piazza to sign any release.  See MSJ Motion ¶ 26, at 6-7. Patel nevertheless

instructs Regional Manager Abir Maru to obtain Piazza's signature that the check is payment "in

full."  MSJ Motion ¶ 26, at 6-7.  Because Piazza is unable to confirm that the check accurately

reflects her hours or pay, and because Patel attempts to condition the check on a written release

the DOL does not require, she refuses to accept or cash the check, despite Patel's pressure.  See

MSJ Motion ¶ 27, at 7.

### 6.    The Defendants' Retaliation and Termination of Piazza.

Patel instructs "Merchant to 'let the Department of Labor know [Plaintiff] is refusing to

sign the acceptance document and accept [the] check' and to 'document this incident.'"  MSJ

Motion ¶ 28, at 7 (quoting WhatsApp Message, from Aman Patel to Jaya Merchant at 40, filed

September 18, 2025 (Doc. 41-1)("WhatsApp Message")).  Patel then strips Piazza of her office,

reassigns her managerial duties to others, and orders her to sit at the front desk performing clerical

work.  See MSJ Motion ¶ 28, at 7.  Patel stationing Piazza at the front desk, in view of staff and

guests, humiliates her, and makes it impossible for her to function as General Manager.  See MSJ

Motion ¶ 28, at 7.  Patel then sends a group text message to senior managers, accusing Piazza of

suffering a "'mental breakdown,'" announcing Patel replaces Piazza, and declaring that she and

her family must "'listen'" to Maru and his wife.  MSJ Motion ¶ 29, at 7 (quoting WhatsApp

Messages at 43).  Thus, within a week of Piazza's refusal to cash the DOL check and her notice

that she retains counsel, Patel banishes her from her office, strips her authority, stations her at the

front desk, and publicly declares that she is mentally unstable and replaced.  See MSJ Motion ¶ 30,

at 7.

On November 28, 2023, Piazza's counsel sends an urgent letter to HK Hospitality's Directors and Members, including Patel, demanding that the retaliation stop. See MSJ Motion ¶ 31, at 8. The letter documents the retaliation -- harassment, intimidation, removal of her General Manager duties, banishment from her office, false claims that her performance is failing, and a hostile work environment so severe that it arguably amounts to constructive discharge -- and demands that the Defendants immediately cease their unlawful retaliation, reminding them of their obligations under the FLSA, and places leadership on clear notice that their treatment of Piazza is both abusive and unlawful. See MSJ Motion ¶ 33, at 8. The Defendants never respond. See MSJ Motion ¶ 34, at 8. Eight days later, Patel and Maru sign a termination letter firing Piazza. See MSJ Motion ¶ 324, at 8.

### 7. Post-Termination Conduct and Wage Claim Proceedings.

After firing Piazza on December 6, 2023, Patel restricts her from the Tucumcari property and withholds her final paycheck. See MSJ Motion ¶ 44, at 10. On December 22, 2023, Piazza sends a written demand to Maru requesting her final paycheck, but the Defendants ignore the request. See MSJ Motion ¶ 45, at 10. On December 26, 2023, after the Defendants ignore her written demand, Piazza files a wage claim with the New Mexico Department of Workforce Solutions ("DWS") asking the agency to compel payment. See MSJ Motion ¶ 46, at 10. At DWS' direction, the Defendants finally pay Piazza her final paycheck on December 28, 2023. See MSJ Motion ¶ 47, at 10. The three-week delay causes serious hardship for Piazza and her family during the holiday season. See MSJ Motion ¶ 47, at 10.

### 8. Defendants' Discovery Noncompliance.

On January 17, 2025, Piazza serves the Defendants with the "Plaintiff's First Requests for Production and First Set of Interrogatories." MSJ Motion ¶ 53, at 11. The request seeks time and

pay records, classification policies, communications about Piazza's employment and termination, documents relating to the DOL investigation, and the factual bases of the Defendants' defenses. See MSJ Motion ¶ 54, at 11-12. The Defendants obtain an extension until March 3, 2025, but fail to serve any responses following the extension. See MSJ Motion ¶ 55, at 12. Piazza's counsel regularly follows up with the Defendants' counsel about the missing discovery. See MSJ Motion ¶ 56, at 12. The Defendants' counsel admits that he still is waiting on his clients, "who were 'a bit slow,'" and later admits in writing that his clients are not cooperating. MSJ Motion ¶ 56, at 12 (quoting the Declaration of Rod M. Johnston in Support of Plaintiff's Motion for Partial Summary Judgment ¶ 12, at 3 (executed September 18, 2025), filed September 18, 2025 (Doc. 41-2)("Johnston Decl.")). Despite Piazza's follow-ups, the Defendants produce no discovery. See MSJ Motion ¶ 56, at 12. On April 11, 2025, following a meet-and-confer telephone call, the parties stipulate in writing that Defendants will serve full discovery responses without objections by April 16, 2025, but the Defendants do not serve any responses. See MSJ Motion ¶ 57, at 12. On April 17, 2025, Piazza files a motion to compel the Defendants to complete responses, to determine that the Defendants waive objections, and to award attorney's fees, the Defendants do not respond. See MSJ Motion ¶ 58, at 12. On August 29, 2025, Piazza files a notice, advising the Court that the motion to compel is fully briefed and unopposed. See MSJ Motion ¶ 59, at 12. On September 3, 2025, Piazza files a motion for sanctions, seeking terminating sanctions or, alternatively, evidentiary sanctions and attorney's fees because of the Defendants' refusal to participate in discovery. See MSJ Motion ¶ 60, at 12.

## PROCEDURAL BACKGROUND

As the Factual Background reflects, this case has a nuanced history. Much of that procedural detail, however, is unnecessary to resolve the Motion presently before the Court.

Accordingly, this section focuses on the procedural history most relevant to the Motion, including: (i) the Motion; (ii) the Defendants' Response to Plaintiff's Motion for Entry of Damages Judgment, filed February 25, 2026 (Doc. 84)("Response"); and (iii) the Plaintiff's Reply in Support of Motion for Entry of Damages Judgment, filed March 2, 2026 (Doc. 86)("Reply"). The Court would overlook an important consideration if it fails to note the Defendants' Motion for Reconsideration of the Court's Order Granting Plaintiff's Motion for Partial Summary Judgment, filed March 2, 20226 (Doc. 85)("Motion to Reconsider"). On March 20, 2026, the Court holds a hearing on both the Motion and the Motion to Reconsider. See Clerks Minutes at 1. At the hearing, the Court denies the Motion to Reconsider and takes under advisement the Motion. This Memorandum Opinion and Order reflect the Court's rulings on the matters remaining unresolved following the hearing.

### 1. The Motion for Entry of Damages.

On January 28, 2026, Piazza files the Motion, requesting that the Court enter damages. See Motion at 1. Piazza makes five requests of the Court regarding damages. See Motion at 1-26. First, Piazza requests that the Court award her unpaid overtime wages under the MWA. See Motion at 5-7. Second, Piazza requests that the Court award her unpaid minimum wages under the MWA. See Motion at 7-9. Third, Piazza requests that the Court award her continuation wages for the late payment of her final wages. See Motion at 9-10. Fourth, Piazza requests that the Court award her prejudgment interest in the amount of ten percent from the date that she serves the Complaint Jury Demand, filed January 15, 2024 (Doc. 1)("Complaint"). Motion at 10-13. Finally, Piazza requests that the Court award her post-judgment interest at a rate of fifteen percent from the date of entry of judgment. See Motion at 13-14.

### a. Unpaid Overtime Wages Calculations.

Piazza requests that the Court award her "$241,997.70" in damages for unpaid overtimes wages under the MWA.  Motion at 6-7.  She comes to this number by trebling the sum of three different periods where she does not receive overtime wages.  See Motion at 5-7.  The arithmetic merits some further explanation, because the unpaid overtime wages for a given period are the product of: (i) her overtime rate, which is 1.5 times her hourly rate, multiplied by thirty-one, which is the number of overtime hours she works each week, and (ii) the number of weeks she works during that period.  See Motion at 5-7.  Piazza's hourly rate changes over the three periods, resulting in a different overtime rate during the three periods.  See Motion at 5-7.  The Court discusses further that arithmetic below.

The first period is from November 21, 2021, through April 10, 2022.  See Motion at 5. During this time the Defendants pay her "a weekly salary of $608.00."  Motion at 5.  Piazza divides the $608.00 by forty hours, determining her hourly rate to be "$15.20 per hour."  Motion at 5.  Take that rate and multiplying it by 1.5, she determines her overtime rate to be "22.80 per hour."  Motion at 6.  Multiplying the "22.80" by thirty-one, she determines that the Defendants owe her "$706.80" for each week during the first period.  Motion at 6.  Because the first period has "20.14 weeks," Piazza determines that the Defendants owe her "$14,235.29 for this period."  Motion at 6.

The second period is from April 11, 2022, through August 13, 2023.  See Motion at 6.  She uses the same arithmetic to calculate her unpaid overtime wages, except that, during the second period, the Defendants pay her "$653.85," resulting in an hourly rate of "$16.35 per hour."  Motion at 6.  The different hourly rate results in a different overtime rate, and she concludes that the Defendants owe her "$55,208.40" for the second period.  Motion at 6.

The third period is from August 14, 2023, through December 6, 2023.  See Motion at 6. She uses the same arithmetic to calculate her unpaid overtime wages, except that, during the second

period, the Defendants pay her "$692.31," resulting in an hourly rate of "$17.31 per hour." Motion at 6. The different hourly rate results in a different overtime rate, and she concludes that the Defendants owe her "$13,222.21" for the third period. Motion at 6.

### b. Unpaid Minimum Wages Calculations.

Piazza requests that the Court award her "$56,823.03" in damages for unpaid minimum wages under the MWA. Motion at 9. She comes to this number by trebling the sum of three different periods where she does not receive minimum wage. See Motion at 5-7. The arithmetic merits some further explanation, because the unpaid minimum wage for a given period is the result of a detailed calculation involving her hourly rate. See Motion at 5-7. In addition to New Mexico changing the minimum wage, Piazza's hourly rate changes over the three periods, resulting in a different minimum wage during the three periods. See Motion at 7-8. The Court discusses further that arithmetic below.

The first period is from November 21, 2021, through December 31, 2021. See Motion at 7-8. During this time, the Defendants pay her "a weekly salary of $608.00." Motion at 7. Piazza divides the $608.00 by the seventy-one hours she works, determining her "effective hourly rate" to be "$8.56 per hour." Motion at 7-8. During this time, "the applicable minimum wage" is "$10.50 per hour," according to Piazza, meaning the "resulting shortfall was $1.94 per hour." Motion at 8. Multiplying the "$1.94" times the seventy-one hours that Piazza works, she determines that the Defendants owe her "$137.74" for each week during the first period. Motion at 8. Because the first period has "5.86 weeks," Piazza determines that the Defendants owe her "$807.14" in unpaid minimum wages. Motion at 8.

From January 1, 2022, through April 10, 2022, Piazza continues to receive the same salary, but, according to Piazza, the minimum wage increases from $10.50 to "$11.50 per hour." Motion

- 11 -

at 8.  As a result, Piazza asserts, the Defendants owe her an additional "$2.94 per hour" instead of the $1.94.  Motion at 8.  Taking the new amount and multiplying by seventy-one hours, Piazza states that the Defendants owe her "$2,983.08" for the remaining time until the next period when her pay increases.  Motion at 8.

The second period is from April 11, 2023, through December 31, 2022, when the Defendants increase her salary to "$653.85."  Motion at 8.  Piazza divides the new salary by the seventy-one hours she works to determine her effective hourly rate is "8.56 per hour, resulting in a larger deficiency of $2.94 per hour."  Motion at 8.  Taking that deficiency and multiplying by seventy-one hours she works, Piazza concludes that the Defendants owe her "$6,157.43" for the "37.86 weeks" which she works during this time period.  Motion at 8.

From January 1, 2023, through August 13, 2023, Piazza continues to receive the same salary, but, according to Piazza, the minimum wage increases from $11.50 to "$12.00 per hour."  Motion at 8.  As a result, Piazza asserts, the Defendants owe her an additional "$2.79 per hour" instead of the $2.94.  Motion at 8.  Taking the new amount and multiplying by seventy-one hours, Piazza states that the Defendants owe her "$6,368.87" for the remaining time until the next period when her pay increases.  Motion at 8.

The third period is from August 14, 2023, through December 6, 2023, when the Defendants increase her salary to "$692.31."  Motion at 8-9.  Piazza divides the new salary by the seventy-one hours that she works to determine her effective hourly rate is "9.75 per hour, resulting in a larger deficiency of $2.25 per hour."  Motion at 9.  Taking that deficiency and multiplying by seventy-one hours she works, Piazza concludes that the Defendants owe her "$2,624.49" for the "16.43 weeks" which she works during this time period.  Motion at 9.

Summing the three pay periods with the changes in the minimum wage, Piazza concludes that the Defendants owe her "$18,941.01" in unpaid minimum wages.  Motion at 9.  Piazza asserts that "treble damages are mandatory under" § 50-4-26(C).  Motion at 9.  Trebling the amount that she calculates, Piazza concludes that the Defendants owe her a "total minimum-wage damages of $56,823.03."  Motion at 9.

### c.     Continuation Wages for Late Payment of Final Wages.

Piazza requests that the Court award her "$1,186.80" in damages for continuation wages. Motion at 10.  Piazza asserts that New Mexico law requires employers to pay all wages an employer owe to a discharged employee within ten days of termination.  Motion at 9 (citing N.M. Stat. Ann. § 50-4-4(B)).  Piazza states that the "admitted record establishes that Defendants terminated Plaintiff's employment on December 6, 2023," making her final wages due no later than December 16, 2023.  Motion at 9-10.  Piazza asserts that the Defendants do not issue her final paycheck until December 28, 2023, and only after Piazza files a wage claim with the DWS.  Motion at 10.  Piazza calculates her continuation wages from December 17, 2023, the day after the statutory deadline expires, through December 28, 2023, for a total of twelve days.  Motion at 10. During this period, Piazza argues that her weekly salary is "$692.31" and her daily wage rate was "$98.90," resulting in continuation wages totaling "$1,186.80."  Motion at 10.

### d.     Prejudgment Interest.

Piazza requests that the Court award her a prejudgment interest rate of ten percent.  See Motion at 10-13.  She asserts that, when a court determines the prejudgment interest rate, it considers "whether the plaintiff caused unreasonably delay in the adjudication of the claims and whether the defendant made a reasonable and timely offer of settlement."  Motion at 11.  Piazza cites Rivera v. McCoy Corp., 240 F. Supp. 3d 1150 (D.N.M. 2017)(Garza, M.J.)("Rivera"), for the

proposition that the statutory maximum is appropriate when "the employer failed to engage in reasonable settlement conduct." Motion at 11. According to Piazza, the Defendants "never made a reasonable or timely offer to resolve Plaintiff's wage claims," and she "did not cause unreasonable delay." Motion at 11. Piazza continues by stating that prejudgment "interest exists to compensate a prevailing employee for the lost use of wages wrongfully withheld and to prevent a defendant from benefiting from delay." Motion at 12. In her view, application "of the maximum ten-percent rate best fulfills the compensatory purpose of § 56-8-4(B)." Motion at 12.

### e.    Post-Judgment Interest.

Piazza requests that the Court award her a post-judgment interest rate of fifteen percent. See Motion at 13-14. According to Piazza, increasing the post-judgment interest rate of "8.75 percent per year" to "15 percent per year" is appropriate, because the "judgment in this case rests on intentional and willful wage violations, as well as retaliatory and bad-faith conduct." Motion at 13. Piazza asserts that the Defendants "classified Plaintiff as exempt from overtime while paying her a salary that did not satisfy the minimum salary level required by law under either the FLSA" or the MWA. Motion at 13. Piazza notes that the "admitted record further establishes bad-faith escalation once Plaintiff asserted her wage rights." Motion at 14. These actions, according to Piazza, warrant "a judgment based on intentional or willful acts and bad faith within the meaning of § 56-8-4(A)(2)." Motion at 14.

### 2.    The Defendants' Response in Opposition to Entry of Damages.

On February 25, 2026, the Defendants file the Response, addressing the Motion. See Response at 1. In the Response, the Defendants make procedural and substantive arguments. See Response at 1-7. In regard to the procedural arguments, the Defendants respond that the Court should deny the Motion, because the "Plaintiff did not request HK's position on the Motion and,

consequently, lacks a recitation of good-faith request for concurrence." Response at 2. According to the Defendants, given "the ongoing failure to properly discharge her obligation to request concurrence in good faith, the Court should . . . summarily deny the Motion." Response at 2. The second procedural argument that the Defendants make is that the Court should deny the Motion, because the Motion to Reconsider challenges "underlying assumptions in calculating damages." Response at 2-3. If the Court grants the Motion to Reconsider, the Defendants argue, the damage calculations in the Motion are no longer accurate. See Response at 2-3.

Substantively, the Defendants make three arguments concerning the Motion and damages. See Response at 3-7. First, the Defendants argue that the Court should not allow Piazza double recovery. See Response at 3. The Defendants assert that Piazza is attempting to double her recovery, because Piazza makes her regular rate "one amount for calculating overtime, and then change[s] that rate to re-recover a portion of that for a minimum wage violation." Response at 3. In the Defendants' estimate the "minimum wage violation is resolved by ensuring that the rate upon which overtime is calculated is at or above the minimum rate." Response at 3-4.

Second, the Defendants argue that the Court should award Piazza a prejudgment interest rate of "0.5%." Response at 5. The Defendants quote N.M. Stat. Ann. § 56-8-4(B), stating:

> "[T]he court in its discretion may allow interest of up to ten percent from the date the complaint is served upon the defendant after considering, among other things: (1) if the plaintiff was the cause of unreasonable delay in the adjudication of the plaintiff's claims; and (2) if the defendant had previously made a reasonable and timely offer of settlement to the plaintiff."

Response at 4 (quoting N.M. Stat. Ann. § 56-8-4(B))(alterations in the Response). The maximum award, ten percent, prejudgment rate that Piazza requests is inappropriate, according to the Defendants, because the Defendants "immediately agreed to pay the calculated amount to settle the claim," after the DOL issues its findings. Response at 5. The Defendants assert that it "acted

in good faith to settle this matter quickly and expeditiously based upon a neutral third party's assessments." Response at 5. The Defendants concede, however, that Piazza "did not cause a delay in resolution." Response at 5. Accordingly, the Defendants conclude, because "only one of the two factors is present, the Court should fairly award Plaintiff half of the average interest rate of a fair investment, i.e. 0.5%." Response at 5.

Finally, the Defendants argue that the Court should award Piazza a post-judgment interest rate of "8.75." Response at 6. The fifteen-percent rate, according to the Defendants, is appropriate "[i]f 'the judgment is based on tortious conduct, bad faith or intentional or willful acts.'" Response at 6 (quoting N.M. Stat. Ann. § 56-8-4(A)(2)). The Defendants argue, moreover, that "the Court did not make a specific finding that HK acted in bad faith, intentionally, or willfully." Response at 6. The reality of the dispute, the Defendants assert, is that "HK complied with the DOL investigation[] [and] immediately rectified the salary to be within the legal limits after the DOL's findings." Response at 6. This compliance, in the Defendants' view, shows their conduct does not justify the post-judgment rate for "bad actors." Response at 6.

### 3.    Piazza's Reply to the Response.

On March 2, 2026, Piazza files the Reply to the Response. Reply at 1. The Reply makes five arguments. See Reply at 1-9. First, Piazza asserts that the Motion is not subject to summary dismissal, because D.N.M. L.R. Civ.'s 7.1(a) case-management rule is for conserving judicial resources. See Reply at 2. In her view, a concurrence is not necessary, because "[i]t was evident that Defendants would oppose" the Motion, meaning "there is no prejudice and no waste of judicial resources." Reply at 2.

Second, Piazza argues that the Motion to Reconsider does not affect damages and is not reason to deny the Motion. See Reply at 2-3. She reasons that the MSJ Order "remains operative,"

and that the "damages motion must be evaluated under the operative Order and the admitted factual record." Reply at 3. Until the Court suspends the MSJ Order's legal effect, Piazza asserts, the damage calculations in the Motion are proper. See Reply at 3. Accordingly, Piazza requests that the Court grant the Motion. See Reply at 3.

Third, Piazza contends that the Defendants' "'double recovery'" theory "misstates the operation of the MWA." Reply at 3. Piazza alleges that the MWA imposes "two independent requirements: payment of at least the statutory minimum wage for each hour worked, § 50-4-22(A), and payment of one and one-half times the regular hourly rate for hours worked in excess of forty, § 50-4-22(D)." Reply at 3. She asserts that "the regular rate for salaried employees is calculated by dividing the weekly salary by forty hours for purposes of determining the overtime premium." Reply at 3-4. As for the minimum wage calculation, Piazza alleges that "compliance is assessed by dividing total weekly compensation by the total number of hours actually worked." Reply at 4. Piazza argues that the "overtime premium calculated using a forty-hour divisor does not retroactively increase that straight-time hourly rate." Reply at 4. Moreover, Piazza continues, "[n]othing in the [Labor Relations Division's Investigations] Manuel suggests that calculating overtime using a forty-hour divisor eliminates or subsumes a separate minimum-wage obligation." Reply at 4. Accordingly, Piazza requests that the Court "apply both" statutory measures. Reply at 5.

Fourth, Piazza argues that the Response "misstates the governing law" concerning prejudgment interest. Reply at 5. Piazza asserts that "56-8-4(B) authorizes an award of prejudgment interest of 'up to ten percent' after consideration of two factors: (1) whether the plaintiff caused unreasonable delay and (2) whether the defendant made a reasonable and timely settlement offer." Reply at 5 (quoting N.M. Stat. Ann. § 56-8-4(B)). The statute, according to

Piazza, does not limit prejudgment interest to the "0.5% based on certificate-of-deposit yields and the acceptance [of] the . . . [DOL's] calculation." Reply at 5. As for the facts, Piazza argues that the Defendants' offer "does not constitute a 'reasonable and timely settlement offer' within the meaning of § 56-8-4(B)." Reply at 5. According to Piazza, the settlement offer is not reasonable, because the DOL's findings do not account for violations of State law, retaliation damages, or prejudgment interest, and because the Defendants attempt to condition the settlement offer "on execution of a written release the DOL had not required." Reply at 5. Piazza further notes that, in "the more than two years since filing, Defendants have not made a single settlement offer addressing the full scope of Plaintiff's statutory claims." Reply at 6. Piazza concludes that the ten-percent rate will compensate her "for the lost opportunity to use money wrongfully withheld between the time the claim accrued and the time of judgment." Reply at 6. The "return available from the risk-free financial instrument," Piazza maintains, will not do the same. Reply at 6. Accordingly, Piazza requests that the Court award prejudgment interest at ten percent. See Reply at 6.

Finally, Piazza argues that the higher post-judgment rate is appropriate, because "the judgment rests on intentional and retaliatory conduct." Reply at 7. Piazza argues that the Defendants' "argument elevates form over substance and misapprehends the governing standard." Reply at 6. She asserts that "the nature of the conduct underlying the judgment" guides the Court's inquiry, even if the Court "did not expressly use the words 'bad faith,' 'intentional,' or 'willful' in its November 13, 2025 Order." Reply at 6-7 (quoting N.M. Stat. Ann. § 56-8-4(A)(2)). The conduct before the Court, according to Piazza, is that: (i) the Defendants retaliate against Piazza under both federal and State law; (ii) FLSA liquidated damages are appropriate, and (iii) the "Defendants' knowingly classified Plaintiff as exempt despite failing the statutory salary threshold,

failed to pay overtime for seventy-hour workweeks, withheld her final wages . . . , and terminated her following protected activity." Rely at 8-9. Accordingly, Piazza requests that the Court award her the fifteen percent rate § 56-8-4(A)(2) describes. Reply at 8.

## LAW REGARDING ASCERTAINING STATE LAW

Ascertaining State law under jurisdiction supplemental to a federal question implicates the same principles that the Supreme Court of the United States articulates in Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1983)("Erie"). Under Erie, a federal district court sitting in diversity applies "state law with the objective of obtaining the result that would be reached in state court." Butt v. Bank of Am., N.A., 477 F.3d 1171, 1179 (10th Cir. 2007). Accord Mem. Hosp. v. Healthcare Realty Trust Inc., 509 F.3d 1225, 1229 (10th Cir. 2007). The Court previously holds that if a district court exercising diversity jurisdiction cannot find a Supreme Court of New Mexico "opinion that [governs] a particular area of substantive law . . . [the district court] must . . . predict how the Supreme Court of New Mexico would [rule]." Guidance Endodontics, LLC v. Dentsply Int'l., Inc., 708 F. Supp. 2d 1209, 1224-25 (D.N.M. 2010)(Browning, J.). "Just as a court engaging in statutory interpretation must always begin with the statute's text, a court formulating an Erie prediction should look first to the words of the state supreme court." Peña v. Greffet, 110 F. Supp. 3d 1103, 1132 (D.N.M. 2015)(Browning, J.).[4] If the Court finds only an opinion from

---

[4] In performing its Erie-mandated duty to predict what a State supreme court will do if faced with a case, see Comm'r v. Estate of Bosch, 387 U.S. 456 (1987), a federal court may sometimes contradict the State supreme court's own precedent if the federal court concludes that the State supreme court would, given the opportunity, overrule its earlier holding, see Anderson Living Tr. v. WPX Energy Prod., LLC, 27 F. Supp. 3d 1188, 1247 n.30 (2014)(Browning, J.). Courts should, obviously, be reticent to formulate an Erie prediction that conflicts with State-court precedent; even if the prediction turns out to be correct, such predictions produce disparate results between cases filed in State and federal courts, as the old State supreme court precedent usually binds State trial courts. The factors to which a federal court should look before making an Erie prediction that a State supreme court will overrule its prior precedent vary depending upon the case, but some consistent ones include: (i) the age of the State supreme court decision from which

the Court of Appeals of New Mexico, while "certainly [the Court] may and will consider the Court

of Appeal[s'] decision in making its determination, the Court is not bound by the Court of

Appeal[s'] decision in the same way that it would be bound by a Supreme Court decision." Mosley

v. Titus, 762 F. Supp. 2d 1298, 1332 (D.N.M. 2010)(Browning, J.)(noting that, where the only

opinion on point is "from the Court of Appeals, . . . the Court's task, as a federal district court

sitting in this district, is to predict what the Supreme Court of New Mexico would do if the case

were presented to it")(citing Wade v. EMCASCO Ins. Co., 483 F.3d 657, 666 (10th Cir.

2007)(explaining that, "[w]here no controlling state decision exists, the federal court must attempt

to predict what the state's highest court would do," and that, "[i]n doing so, it may seek guidance

from decisions rendered by lower courts in the relevant state")).[5]  The Court also may rely on the

---

the federal court is considering departing -- the younger the State case is, the less likely it is that departure is warranted; (ii) the amount of doctrinal reliance that the State courts -- especially the State supreme court -- have placed on the State decision from which the federal court is considering departing; (iii) apparent shifts away from the doctrine that the state decision articulates, especially if the State supreme court has explicitly called an older case's holding into question; (iv) changes in the composition of the State supreme court, especially if mostly dissenting justices from the earlier State decision remain on the court; and (v) the decision's patent illogic or its inapplicability to modern times.  See Peña v. Greffet, 110 F. Supp. 3d 1103, 1132 n.17 (D.N.M. 2015)(Browning, J.).  In short, a State supreme court case that a federal court Erie predicts will be overruled is likely to be very old, neglected by subsequent State-court cases -- perhaps because it is in a dusty corner of the common law which does not get much attention or have much application -- and clearly wrong.

[5] The Supreme Court addresses what the federal courts may use when there is not a decision on point from the State's highest court:

> The highest state court is the final authority on state law, but it is still the duty of the federal courts, where the state law supplies the rule of decision, to ascertain and apply that law even though it has not been expounded by the highest court of the State.  An intermediate state court in declaring and applying the state law is acting as an organ of the State and its determination, in the absence of more convincing evidence of what the state law is, should be followed by a federal court in deciding a state question.  We have declared that principle in *West v. American Telephone and Telegraph Co.*, 311 U.S. 223 (1940), decided this day.  It is true that in that case an intermediate appellate court of the State had determined the immediate question

United States Court of Appeals for the Tenth Circuit's decisions interpreting New Mexico law. See

Anderson Living Tr. v. WPX Energy Prod., LLC, 27 F. Supp. 3d 1188, 1243 n.30 (D.N.M.

2014)(Browning, J.).[6]   Ultimately, "the Court's task is to predict what the state supreme court

     as between the same parties in a prior suit, and the highest state court had refused
to review the lower court's decision, but we set forth the broader principle as
applicable to the decision of an intermediate court, in the absence of a decision by
the highest court, whether the question is one of statute or common law.

. . . .

     We have held that the decision of the Supreme Court upon the construction of a
state statute should be followed in the absence of an expression of a countervailing
view by the State's highest court, and we think that the decisions of the Court of
Chancery [the New Jersey trial court] are entitled to like respect as announcing the
law of the State.

. . . .

     The question has practical aspects of great importance in the proper
administration of justice in the federal courts.  It is inadmissible that there should
be one rule of state law for litigants in the state courts and another rule for litigants
who bring the same question before the federal courts owing to the circumstance of
diversity of citizenship.  In the absence of any contrary showing, the rule [set forth
by two New Jersey trial courts, but no appellate courts] appears to be the one which
would be applied in litigation in the state court, and whether believed to be sound
or unsound, it should have been followed by the Circuit Court of Appeals.

Fid. Union Trust Co. v. Field, 311 U.S. 169, 177-80 (1940)(footnotes and citations omitted).  The
Supreme Court has softened this position over the years; federal courts are no longer bound by
state trial or intermediate court opinions, but "should attribute [them] some weight . . . where the
highest court of the State has not spoken on the point."  Comm'r v. Estate of Bosch, 387 U.S. at
465 (citing King v. Order of United Commercial Travelers, 333 U.S. 153, 159 (1948)).  See 17A
James Wm. Moore et al., Moore's Federal Practice § 124.20 (3d ed. 1999)("Moore's")("Decisions
of intermediate state appellate courts usually must be followed . . . [and] federal courts should give
some weight to state trial courts decisions."(emphasis and title case omitted)).

    [6] In determining the proper weight to accord Tenth Circuit precedent interpreting New
Mexico law, the Court must balance the need for uniformity between federal court and state court
interpretations of state law with the need for uniformity among federal judges.  If the Court adheres
too rigidly to Tenth Circuit case law, ignoring changes undergone by a state's law in the ensuing
years, then parties litigating state-law claims will be subject to a different body of substantive law,
depending on whether they litigate in state court or federal court.  This result frustrates the purpose

of Erie, which held that federal courts must apply state court interpretations of state law, rather than their own, in part so that parties achieve a consistent result regardless of the forum. This consideration pulls the Court toward according Tenth Circuit precedent less weight and according state court decisions issued in the ensuing years more weight. On the other hand, when the state law is unclear, it is desirable for there to at least be uniformity among federal judges as to its proper interpretation. Otherwise, different federal judges within the same circuit -- or even the same district, as district courts' decisions are not binding, even upon themselves -- would be free to adopt differing interpretations of a state's law. This consideration pulls the Court towards a stronger respect for vertical stare decisis, because a Tenth Circuit decision on point -- regardless whether it accurately reflects state law -- at least provides consistency at the federal level, so long as federal district judges are required to follow it.

The Court must decide how to weigh Tenth Circuit case law against more-recent state court decisions, choosing a point on the spectrum between the two extremes: rigidly adhering to Tenth Circuit precedent unless there is intervening case law directly on point from the state's highest court, on one end; and independently interpreting the state law, regarding the Tenth Circuit precedent as no more than persuasive authority, on the other. In striking this balance, the Court notes that it is generally more concerned about systemic inconsistency between the federal courts and the state courts than it is about inconsistency among federal judges. Judges, even those within a jurisdiction with ostensibly identical governing law, sometimes interpret and apply the law differently from one another; this inconsistency is part and parcel of a common-law judicial system. More importantly, litigants seeking to use forum selection to gain a substantive legal advantage cannot easily manipulate such inconsistency: cases are assigned randomly to district judges in this and many federal districts; and, regardless, litigants cannot know for certain how a given judge will interpret the state law, even if they could determine the identity of the judge pre-filing or pre-removal. All litigants know in advance is that whomever federal district judge they are assigned will look to the entirety of the state's common law in making his or her determination -- the same as a state judge would. Systemic inconsistency between the federal courts and state courts, on the other hand, not only threatens the principles of federalism, but litigants may more easily manipulate the inconsistency. When the Tenth Circuit issues an opinion interpreting state law, and the state courts subsequently shift away from that interpretation, litigants -- if the district courts strictly adhere to the Tenth Circuit opinion -- have a definite substantive advantage in choosing the federal forum over the state forum, or vice versa.

The Court further notes that district courts may be in a better position than the Tenth Circuit to be responsive to changes in state law. Tenth Circuit decisions interpreting a particular state's law on a specific issue are further apart in time than the collective district courts' decisions are. More importantly, the Tenth Circuit does not typically address such issues with the frequency that the state's courts themselves do. Accordingly, Tenth Circuit precedent can lag behind state law developments -- developments that the district courts may be nimble enough to perceive and adopt. Additionally, much of the benefit of having a consistent Tenth Circuit-wide interpretation of a particular state's law is wasted. Other than Oklahoma, every state encompassed by the Tenth Circuit contains only one federal judicial district, and there is relatively little need for federal judges in Wyoming and Kansas to have a uniform body of New Mexico law to which to look. Last, the Court notes, respectfully, that district courts may be in a better position than the Tenth Circuit to develop expertise on the state law of the state in which they sit. Every federal judicial district in the nation, except the District of Wyoming, covers at most one state. It is perhaps a

more workable design for each district court to keep track of legal developments in the state law of its own state(s) than it is for the Tenth Circuit to monitor separate legal developments in eight states. The Tenth Circuit used to follow this rationale in applying a clearly erroneous standard of review to district judge decisions of state law with no controlling state Supreme Court precedent. See Weiss v. United States, 787 F.2d 518, 525 (10th Cir. 1986); Rawson v. Sears, Roebuck, & Co., 822 F.2d 908, 923 (10th Cir. 1987)(McKay, J., dissenting)(collecting cases). Since the mid-1980s, however, the Tenth Circuit has abandoned that rationale and applied a de novo standard of review to district judge decisions applying state law with no governing state Supreme Court precedent. See Rawson v. Sears, Roebuck, & Co., 822 F.2d at 908. See also id. at 923 (McKay, J., dissenting)(noting that the majority had abandoned the "sanctified" clearly erroneous standard or, the "so-called local-judge rule" in its analysis). The Court regrets the Tenth Circuit's retreat from the clearly erroneous standard.

Having outlined the relevant considerations, the Court thinks the proper stance on vertical stare decisis in the context of federal court interpretations of state law is as follows: the Tenth Circuit's cases are binding as to their precise holding -- what the state law was on the day the opinion was published -- but lack the positive precedential force that its cases interpreting a federal statute or the Constitution of the United States of America possess. A district court considering a state law issue after the publication of a Tenth Circuit opinion on point may not come to a contrary conclusion based only on state court cases available to and considered by the Tenth Circuit, but it may come to such a conclusion based on intervening state court cases.

When interpreting state law, the Tenth Circuit does not and cannot issue a case holding that $x$ is the law in New Mexico; it holds that the proper interpretation of New Mexico law, at the time the opinion is released, is $x$. Its holdings are descriptive, not prescriptive -- interpretive, not normative. Because federal judicial opinions lack independent substantive force on state law issues, but possess such force regarding federal law issues, the Court thinks the following is not an unfair summary of the judicial interpretive process: (i) when interpreting federal law, the federal appellate courts consider the existing body of law, and then issue a holding that both reflects and influences the body of law; that holding subsequently becomes a part of the body of law; but (ii) when interpreting state law, the federal appellate courts consider the existing body of law, and then issue a holding that only reflects the body of law; that holding does not subsequently become a part of the body of law. The federal district courts are bound to conclude that the Tenth Circuit's reflection of the then-existing body of law was accurate. The question is whether they should build a doctrine atop the case and use the existence of the Tenth Circuit's case to avoid any responsibility to independently consider the whole body of state law that exists when the time comes that diversity litigants raise the issue in their courtrooms. Giving such effect to the Tenth Circuit's interpretations of state law is at tension with Erie, giving independent substantive effect to federal judicial decisions -- i.e., applying federal law -- in a case brought in diversity.

The purpose of Erie is well-known and simple, and the Court should not complicate it beyond recognition: it is that the same substantive law governs litigants' cases regardless whether they are brought in a federal or state forum. For simplicity's sake, most courts have settled on the formulation that "the federal court must attempt to predict how the states' highest court would rule if confronted with the issue." Moore's § 124.22[3] (citing Comm'r v. Estate of Bosch, 387 U.S. at 465 ("[A]n intermediate appellate state court [decision] is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise."(citation and internal quotation marks

omitted)).  This statement may not be the most precise formulation if the goal is to ensure identical outcomes in state and federal court -- the Honorable Milton I. Shadur, United States District Judge for the Northern District of Illinois, looks to state procedural rules to determine in which state appellate circuit the suit would have been filed were it not in federal court, and then applies the state law as that circuit court interprets it, see Abbott Laboratories v. Granite State Ins. Co., 573 F. Supp. 193, 196-200 (N.D. Ill. 1983)(noting that the approach of predicting the state supreme court's holdings will often lead to litigants obtaining a different result in federal court than they would in state court, where only the law of the circuit in which they filed -- and certainly not nonexistent, speculative state supreme court law -- governs) -- but it is a workable solution that has achieved consensus.  See Allstate Ins. Co. v. Menards, Inc., 285 F.3d 630, 637 (7th Cir. 2002)("[W]e adhere today to the general rule, articulated and applied throughout the United States, that, in determining the content of state law, the federal courts must assume the perspective of the highest court in that state and attempt to ascertain the governing substantive law on the point in question.").  This formulation, built out of ease-of-use, does not relieve courts of their Supreme Court-mandated obligation to consider state appellate and trial court decisions.  To the contrary, even non-judicial writings by influential authors, statements by state supreme court justices, the closeness of the vote on a prior case addressing the issue, and personnel changes on the court -- considerations that would never inform a federal court's analysis of federal law -- may validly come into play.  The question is whether the district courts must abdicate, across-the-board, the "would decide" aspect of the Erie analysis to their parent appellate courts when the Court of Appeals has declared an interpretation of state law.

The Erie doctrine results in federal cases that interpret state law withering with time.  While cases interpreting federal law become more powerful over time -- forming the groundwork for doctrines, growing upward from one application (Congress may create a national bank) to many (Congress may set quotas on wheat-growing for personal consumption), expanding outward from the general (states must grant criminal jury trials) to the specific (the jury need not be twelve people, nor must it be unanimous) -- federal cases interpreting state law often become stale.  New state court cases -- even when not directly rebuking the federal court's statement of law -- alter the common-law legal landscape with their dicta, their insinuations, and their tone.  The Supreme Court, which picks its cases sparingly and for maximum effect, almost never grants certiorari to resolve issues of state law.

The Court's views on Erie, of course, mean little if the Tenth Circuit does not agree.  In Wankier v. Crown Equipment Corp., the Tenth Circuit said that,

> [w]here no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do.  In performing this ventriloquial function, however, the federal court is bound by ordinary principles of *stare decisis*.  Thus, when a panel of this Court has rendered a decision interpreting state law, that interpretation is binding on district courts in this circuit, and on subsequent panels of this Court, unless an intervening decision of the state's highest court has resolved the issue.

Wankier v. Crown Equip. Corp., 353 F.3d 862, 866 (10th Cir. 2003)(McConnell, J.).  From this passage, it seems clear the Tenth Circuit permits a district court to deviate from its view of state law only on the basis of a subsequent case "of the state's highest court."  The American Heritage

Dictionary of the English Language 1402 (William Morris ed., New College ed. 1976)(defining "unless" as "[e]xcept on the condition that; except under the circumstances that"). A more aggressive reading of the passage -- namely the requirement that the intervening case "resolv[e] the issue" -- might additionally compel the determination that any intervening case law must definitively and directly contradict the Tenth Circuit interpretation in order to be considered "intervening."

It is difficult to know whether Judge McConnell's limitation of "intervening decision" to cases from the highest state court was an oversight or intentional. Most of the Tenth Circuit's previous formulations of this rule have defined intervening decisions inclusively as all subsequent decisions of "that state's courts," a term which seems to include trial and intermediate appellate courts. Even Koch v. Koch Industries, Inc., 203 F.3d 1202, 1231 (10th Cir. 2000), the primary authority upon which Wankier v. Crown Equipment Corp. relies, uses the more inclusive definition. In fact, Wankier v. Crown Equipment Corp. quotes its relevant passage:

> In the absence of intervening Utah authority indicating that a plaintiff is not required to prove a safer, feasible alternative design, we are bound to follow the rule of *Allen* [v. Minnstar, Inc., 8 F.3d 1470 (10th Cir. 1993), a Tenth Circuit case interpreting an issue of Utah law], as was the district court. "Following the doctrine of stare decisis, one panel of this court must follow a prior panel's interpretation of state law, absent a supervening declaration to the contrary by that state's courts or an intervening change in the state's law." Koch v. Koch Indus., Inc., 203 F.3d at 1231.

Wankier v. Crown Equip. Corp., 353 F.3d at 867.

Regardless whether the decision to limit the intervening authority a district court can consider was intentional or not, the Tenth Circuit has picked it up and run with it. In Kokins v. Teleflex, Inc., the Tenth Circuit, quoting Wankier v. Crown Equipment Corp., refused to consider an opinion from the Court of Appeals of Colorado holding directly the opposite of an earlier Tenth Circuit interpretation of Colorado law. See Kokins v. Teleflex, Inc., 621 F.3d 1290, 1297 (10th Cir. 2010)(Holmes, J.)("[T]he Colorado Court of Appeals decided *Biosera*[, Inc. v. Forma Scientific, Inc., 941 P.2d 284 (Colo. Ct. App. 1998)], so it is not an 'intervening decision of the state's *highest court*.'"(emphasis in original)(quoting Wankier v. Crown Equip. Corp., 353 F.3d at 866)).

The Tenth Circuit has set forth a stringent restriction on its district courts' ability to independently administer the Erie doctrine. More importantly, the Tenth Circuit's view may be at tension with the above-quoted Supreme Court precedent, as well as its own prior case law. Moore's lists the Tenth Circuit as having been, at one time, a "court[ that] hold[s] that a prior federal appellate decision [interpreting state law] is persuasive." Moore's § 124.22[4] (citing State Farm Mut. Auto. Ins. Co. v. Travelers Indem. Co., 433 F.2d 311, 312 (10th Cir. 1970)). Still, the Court is bound to abide by the Tenth Circuit's interpretation of Erie.

would do." Wade v. EMCASCO Ins. Co., 483 F.3d at 666. Accord Mosley v. Titus, 762 F. Supp. 2d at 1332 (citation omitted); Rimbert v. Eli Lilly & Co., 577 F. Supp. 2d 1174, 1188-89 (D.N.M. 2008)(Browning, J.)(quoting Wade v. EMCASCO Ins. Co., 483 F.3d at 665-66).

## LAW REGARDING THE FLSA

The FLSA requires covered employers to pay a minimum wage, and to pay their nonexempt employees overtime pay of time and one half their regular rate of pay for hours worked in excess of forty in a work week. See 29 U.S.C. §§ 206-207. The FLSA provides five means of enforcement: (i) criminal prosecutions for willful violators, see 29 U.S.C. § 216(a); (ii) individual civil causes of action to recover unpaid minimum wages, overtime compensation and certain liquidated damages, see 29 U.S.C. § 216(b); (iii) collective actions to recover damages, which are opt-in class actions, see 29 U.S.C. § 216(b); (iv) a cause of action allowing the Secretary of the Department of Labor to recover employees' damages and for additional recovery of "an equal amount of liquidated damages," 29 U.S.C. § 216(c); and (v) a suit for injunctive relief, see 29 U.S.C. § 217. "The principal congressional purpose in enacting the Fair Labor Standards Act of 1938 was to protect all covered workers from substandard wages and oppressive working hours, 'labor conditions [that are] detrimental to the maintenance of the minimum standard of living necessary for health, efficiency and general well-being of workers.'" Barrentine v. Arkansas-Best Freight Sys., Inc., 450 U.S. 728, 739 (1981)(alterations in original)(quoting 29 U.S.C. § 202(a)).

FLSA § 7 requires employers to pay covered employees who, in a given workweek, work more than forty hours "at a rate not less than one and one-half times the regular rate at which [the employee] is employed." 29 U.S.C. § 207(a)(1). "The purpose of FLSA overtime is 'to compensate those who labored in excess of the statutory maximum number of hours for the wear and tear of extra work and to spread employment through inducing employers to shorten hours

because of the pressure of extra cost.'"  Chavez v. City of Albuquerque, 630 F.3d 1300, 1304 (10th Cir. 2011)(Briscoe, J.).    The Tenth Circuit recognizes "that a contract cannot designate an artificially low regular rate in order to reduce the minimum statutory overtime due . . . , [as] parties cannot avoid the purposes of the FLSA by designating a fictitious regular rate."  Chavez v. City of Albuquerque, 630 F.3d at 1305 (citing Walling v. Wall Wire Prods. Co., 161 F.2d 470, 473 (6th Cir. 1947)).

> Much like the protections that the United States Constitution provides to United States citizens, the Court sees the FLSA as a minimum standard. Employers are not allowed to provide their employees less protection . . . than the Act provides. If the employer wishes, however, it may provide its employees more protections than the Act dictates.

Rodriguez v. City of Albuquerque, 687 F. Supp. 2d 1270, 1309 (D.N.M. 2009)(Browning, J.), aff'd in part, rev'd in part and remanded, 420 F. App'x 845 (10th Cir. 2011).

Under the FLSA, an employer must pay its employees for the time that it "employ[s]" them, the statutory definition of which means "to suffer or permit to work."  29 U.S.C. § 203(g). See 29 C.F.R. § 785.6 ("By statutory definition the term 'employ' includes (section 3(g)) 'to suffer or permit to work.'  The act, however, contains no definition of 'work.'").  "The test for whether an employee's time constitutes working time is whether the time is spent predominantly for the employer's benefit or for the employee's."  United Transp. Union Local 1745 v. City of Albuquerque, 178 F.3d 1109, 1116 (10th Cir. 1999)(internal quotation marks omitted)(quoting Gilligan v. City of Emporia, 986 F.2d 410, 412 (10th Cir. 1993)).  The Supreme Court has rejected the argument that Congress' intent in enacting the FLSA was to compensate employees "for all actual work . . . as those words are commonly used -- as meaning physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business."  Armour & Co. v. Wantock, 323 U.S.

126, 132 (1944)(quoting <u>Tenn. Coal, Iron & R.R. v. Muscoda Local No. 123</u>, 321 U.S. 590, 597 (1944)).  The Supreme Court explains:

> [A]n employer, if he chooses, may hire a man to do nothing, or to do nothing but wait for something to happen.  Refraining from other activity often is a factor of instant readiness to serve, and idleness plays a part in all employments in a stand-by capacity.  Readiness to serve may be hired, quite as much as service itself, and time spent lying in wait for threats to the safety of the employer's property may be treated by the parties as a benefit to the employer.  Whether time is spent predominantly for the employer's benefit or for the employee's is a question dependent upon all the circumstances of the case.

<u>Armour & Co. v. Wantock</u>, 323 U.S. at 133.

FLSA § 6 requires employers to pay their employees a minimum wage.  <u>See</u> 29 U.S.C. § 206(a).  Deductions from employees' paychecks, for whatever reason, that bring the employees' pay under the minimum wage violate § 6.  <u>See</u> <u>Donovan v. Simmons Petrol. Corp.</u>, 725 F.2d 83, 84 (10th Cir. 1983)(holding that the employer's deductions of "cash register shortages and the amount of uncollectible checks accepted by its employees from the paychecks of employees who were on duty when the shortages occurred" was a willful FLSA violation).  <u>Cf.</u> <u>Dole v. Solid Waste Servs., Inc.</u>, 733 F. Supp. 895, 924 (E.D. Pa. 1989)(Huyett, J.)(concluding that deductions "for lunch breaks during which [employees were] required to continue with any duties relating to . . . work," bringing employees below minimum wage, violated the FLSA).  Further, FLSA § 11 imposes on an employer a duty to "make, keep, and preserve" records of its employees' wages, hours, and "other conditions and practices of employment" that the employer may maintain. 29 U.S.C. § 211(c).  In <u>Donovan v. Simmons Petroleum Corporation</u>, the Tenth Circuit recognized the employers' duty under the FLSA to keep accurate records in discussing the shift of the burden to prove damages between the employee and the employer:

> The employee bears the burden of proving he performed work for which he was not properly compensated.  <u>Anderson v. Mt. Clemens Pottery Co.</u>, 328 U.S. 680, 687 (1946).  However, employers have a duty to keep accurate records.  If

employers do not keep accurate records the employee's burden is extremely difficult. In order to prevent the employee from being penalized by the employer's failure to keep adequate records, the Supreme Court held in Anderson that an employee carries his burden by proving that he has "in fact performed work for which he was improperly compensated and . . . [producing] sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." Id. Upon such a showing, the burden shifts to the employer to produce evidence of the precise amount of work performed or to negate the reasonableness of the inference drawn from the employee's evidence. If the employer does not rebut the employee's evidence, then damages may be awarded even though the result is only approximate. The employer cannot complain that the damages lack the precision that would have been possible if the employer had kept the records required by law. Id. at 687-88.

Donovan v. Simmons Petrol. Corp., 725 F.2d at 85-86. The federal Department of Labor's Wage and Hour Division requires that employers must maintain in their records the time of day and day of the week on which the employee's workweek begins, the regularly hourly pay rate for the employee in any week in which overtime compensation is due, the hours worked each workday and workweek, the total daily or weekly straight-time earned, and the total overtime. See 29 C.F.R. § 516.2(a). Where an employer violates its § 211(c) record-keeping duties, including by not counting time worked before and after an employee's shift begins, the employer cannot meet its burden to rebut the Labor and Wage investigators' reasonable estimates of backpay due to the employees. See Metzler v. IBP, Inc., 127 F.3d 959, 965-66 (10th Cir. 1997)("When the employer has failed to record compensable time . . . , [t]he employer cannot be heard to complain that the damages lack the exactness and precision of measurement that would be possible had he kept records in accordance with the requirements of [29 U.S.C. § 211(c) ]."); U.S. Dep't of Labor v. Cole Enters., Inc., 62 F.3d 775, 781 (6th Cir. 1995)("We agree with the district court's conclusion that the calculations of the investigator are a reasonable and generous estimate of the back wages due to the Defendants' employees for the pre-shift and postshift hours worked.").

- 29 -

Section 7(a) sets forth the general rule for calculating overtime.  See 29 U.S.C. § 207(a)(1). Because the FLSA does not put a limit "on the number of hours that an employee may work in any workweek, he may work as many hours a week as he and his employer see fit, [but, the employer must pay] the required overtime compensation . . . for hours worked in excess of the maximum workweek prescribed by section 7(a)."  29 C.F.R. § 778.102.  The statute states:

> Except as otherwise provided in this section, no employer shall employ any of his employees . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

29 U.S.C. § 207(a)(1).  See 29 C.F.R. § 778.107 ("The general overtime pay standard in section 7(a) requires that overtime must be compensated at a rate not less than one and one-half times the regular rate at which the employee is actually employed.").  The statute's language demands that an employee receive one and one-half times the "regular rate" of pay for hours that he or she works in excess of forty in a given week.  29 U.S.C. § 207(a)(1).

One important principle is that FLSA overtime is based on the number of hours worked in a particular workweek.  Browning

> The Act does not . . . require . . . that an employee be paid overtime compensation for hours in excess of eight per day, or for work on Saturdays, Sundays, holidays or regular days of rest.  If not more than the maximum hours prescribed in the Act are actually worked in the workweek, overtime pursuant to section 7(a) need not be paid.

29 C.F.R. § 778.102.  On the other hand, that the FLSA does not require that the employer pay overtime for those hours does not relieve an employer from paying overtime for them if the contract of employment demands them.  See 29 C.F.R. § 778.102.

For purposes of calculating overtime under the FLSA, however, the only concern is whether the total hours worked in a given workweek are above or below the statutory requirement

for overtime compensation. See 29 C.F.R. § 778.102. A second important principle about calculating overtime under the FLSA is that the employee must receive overtime pay at a rate of no less than one and one-half times the "regular rate" for which the employer employs the employee. Walling v. Youngerman-Reynolds Hardwood Co., 325 U.S. 419, 424 (1945)("The keystone of Section 7(a) is the regular rate of compensation."). The Supreme Court described "the regular rate" as "the hourly rate actually paid the employee for the normal, non-overtime workweek for which he is employed." Walling v. Youngerman-Reynolds Hardwood Co., 325 U.S. at 424. Since the Supreme Court's opinion in Walling v. Youngerman-Reynolds Hardwood Co., Congress has amended the FLSA to include a description of regular rate, see 29 U.S.C. § 207(e) (stating that "the 'regular rate' at which an employee is employed shall be deemed to include all remuneration for employment paid to, or on behalf of, the employee," with eight statutory exceptions),[7] and the interpretive bulletins have incorporated the Supreme Court's definition, see 29 C.F.R. § 778.108 ("The Supreme Court has described it as the hourly rate actually paid the employee for the normal, nonovertime workweek for which he is employed -- an 'actual fact.'"). Generally, the exceptions include overtime pay and compensation that is discretionary on the employer's part. See 29 C.F.R. § 779.108.

---

[7] The FLSA now contains a description of what is included in the regular rate, but still contains no definition precisely setting forth how it is calculated. See Scott v. City of N.Y., 592 F. Supp. 2d 475, 482 (S.D.N.Y. 2008)(Scheindlin, J.)("The words 'regular rate' are not defined in the Act." (quoting Walling v. Helmerich & Payne, Inc., 323 U.S. 37, 40 (1944))(internal quotation marks omitted)).

## LAW REGARDING THE NMMWA

The NMMWA requires that employers pay an employee "one-half times the employee's regular hourly rate of pay" for all hours that the employee works over forty hours in a seven-day week. N.M. Stat. Ann. § 50-4-22. Such provisions advance two public policies:

> (1) to establish minimum wage and overtime compensation standards for all workers at levels consistent with their health, efficiency and general well-being, and (2) to safeguard existing minimum wage and overtime compensation standards which are adequate to maintain the health, efficiency and general well-being of workers against the unfair competition of wage and hours standards which do not provide adequate standards of living.

N.M. Stat. Ann. § 50-4-19(D). To succeed on a NMMWA overtime compensation claim, a plaintiff must establish: "(a) they worked more than forty hours a week, (b) that management knew or should have known that they did so, and (c) that they were not compensated for the overtime." Self v. United Parcel Serv., Inc., 1998-NMSC-046, ¶ 15, 126 N.M. 396, 403, 970 P.2d 582, 589.

For the NMMWA's purposes, the term "employer" "includes any individual, partnership, association, corporation, business trust, legal representative or any organized group of persons employing one or more employees at any one time, acting directly or indirectly in the interest of an employer in relation to an employee." N.M. Stat. Ann. § 50-4-21(B). "Employee" means "an individual employed by an employer," N.M. Stat. Ann. § 50-4-2(C), but excludes "forepersons, superintendents and supervisors," N.M. Stat. Ann. § 50-4-21(C)(1). When interpreting the NMMWA, the Supreme Court of New Mexico considers law interpreting the FLSA to be persuasive. See Valentine v. Bank of Albuquerque, 1985-NMSC-033, ¶ 4, 102 N.M. 489, 490, 697 P.2d 489, 490 (conflating analyses of the NMMWA and the FLSA, and citing law on the FLSA). See also Corman v. JWS of New Mexico, Inc., 356 F. Supp. 3d 1148, 1160 (D.N.M. 2018)(Browing J.).

## ANALYSIS

The Court's analysis begins with the case's procedural posture, because the posture defines the admitted factual record upon which the Court resolves the parties' disputes. See Niemyjski v. City of Albuquerque, 379 F. Supp. 2d 1221 (D.N.M. 2005)(Browning, J.)(stating that non-responding "party 'waive[s] the right to file a response and confesses all facts asserted'")(quoting Murray v. City of Tahlequah, 312 F.3d 1196, 1199 (10th Cir.2002)("Murray")). See Palzer v. CoxCom, LLC, 833 F. App'x 192, 200 (10th Cir. 2020)("Palzer")("But by failing to timely respond to the MSJ, Palzer confessed the facts set forth in the motion and waived the right to controvert them.").[8] The posture surrounding the Motion is that the Court deems Piazza's uncontroverted facts in the MSJ Motion admitted. See MSJ Order at 1-4. After reviewing those facts and the applicable law, and holding a hearing on October 22, 2025, the Court concludes that partial summary judgment is appropriate. See MSJ Order at 1 ("Having reviewed the motion, the supporting declarations (ECF 41-1, 41-2), and the applicable law, and having heard argument at the October 22, 2025, hearing, the Court finds and concludes as follows . . . ."). Against this backdrop, the Court first addresses the Motion to Reconsider and the procedural consequences

---

[8] Palzer v. CoxCom, LLC, is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value."). The United States Court of Appeals for the Tenth Circuit states:

In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005). The Court concludes that Palzer v. CoxCom, LLC, 833 F. App'x 192 (10th Cir. 2020) has persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

flowing from the Defendants' failure to controvert Piazza's factual assertions with admissible evidence. The Court then turns to the Motion's substance. Specifically, the Court addresses whether the MWA permits Piazza to recover both unpaid minimum wages and unpaid overtime wages from the same compensation structure. The Court next considers whether N.M. Stat. Ann. §§ 50-4-4(B), (C) entitles Piazza to continuation wages for the Defendants' untimely payment of final wages following her termination. Finally, the Court addresses prejudgment and post-judgment interest, including whether the Defendants' conduct -- including their compensation practices and their retaliation against Piazza after she asserts her statutory rights -- constitutes the willful and intentional bad faith conduct warranting enhanced post-judgment interest under New Mexico law. Through each issue, the same theme remains constant: the Court's conclusions flow from the undisputed factual record that the parties place before it.

I.    **THE COURT ENTERS PARTIAL SUMMARY JUDGMENT IN PIAZZA'S FAVOR, BECAUSE THE MSJ MOTION SHOWS THERE IS NO GENUINUE ISSUE OF MATERIAL FACT, AND SHE IS ENITTLED TO JUDGMENT AS A MATTER OF LAW.**

Piazza properly supports the MSJ Motion as rule 56(c) requires, meeting her "initial burden of demonstrating that no material issues of fact remain for trial and the moving party is entitled to judgment as a matter of law." Murray, 312 F.3d at 1200. "[A] party's failure to file a response to a summary judgment motion is not, by itself, a sufficient basis on which to enter judgment against the party." Reed v. Bennett, 312 F.3d 1190, 1195 (10th Cir.2002). A "district court must make the additional determination that judgment for the moving party is appropriate under Rule 56." Reed v. Bennett, 312 F.3d at 1195.

Rule 56(e) contemplates the consequences of failing to oppose a summary judgment motion stating:

Failing to Properly Support or Address a Fact. If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:

(1)     give an opportunity to properly support or address the fact;

(2)     consider the fact undisputed for purposes of the motion;

(3)     grant summary judgment if the motion and supporting materials -- including the facts considered undisputed -- show that the movant is entitled to it; or

(4)     issue any other appropriate order.

Fed. R. Civ. P. 56(e).  The Supreme Court interprets the nomovant's burden to respond as arising "only if the summary judgment motion is properly 'supported' as required by rule 56(c)." Murray, 312 F. 3d at 1200 (quoting Adickes v. S.H. Kress & Co., 398 U.S. 144, 160-61(1970)).  Failing to file a response within the time that the local rule specifies, however, waives "the nonmovant's 'right to file a response or to controvert the facts asserted in the summary judgment motion.'" Palzer, 833 F. App'x at 197 (quoting Reed v. Bennett, 312 F.3d at 1194).

Here, the Defendants make no meaningful effort to controvert the Court's conclusion that Piazza sufficiently supports the MSJ Motion, making summary judgment appropriate. See Motion to Reconsider 1-23.  Instead, the Defendants attempt improperly to refute Piazza's facts with evidence that the Court does not admit into the record, because the Defendants waive their right to file a response or controvert the facts Piazza asserts. See Motion at Reconsider at 1-23.  As justification for their conduct, the Defendants allege "a collapse of Defendants' relationship with their prior attorneys."  Motion to Reconsider at 1.  The Defendants make no attempt to show that this breakdown meets the Tenth Circuit's "excusable neglect" standard. Palzer, 833 F. App'x at 196 ("Under Fed. R. Civ. P. 6(b)(1)(B), a district court has discretion to accept a party's late filing

if the party files a motion showing that the delay was the result of 'excusable neglect.'")(quoting Fed. R. Civ. P. 6(b)(1)(B)).

**A.    THE DEFENDANTS' CONDUCT IS NOT EXCUSABLE NEGLECT, BECAUSE THE DELAY IS WITHIN THEIR REASONABLE CONTROL**.

In determining whether there is "excusable neglect," the Tenth Circuit directs district courts to consider "'all relevant circumstances.'" Palzer, 833 F. App'x at 196 (quoting Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship, 507 U.S. 380, 395 (1993)). A non-exhaustive list of relevant circumstances includes: (i) the danger of prejudice to the opposing party; (ii) the length of the delay and its potential impact on judicial proceedings; (iii) the reason for the delay, including whether it is within the movant's reasonable control; and (iv) whether the movant acts in good faith. See Palzer, 833 F. App'x at 196. "'The most important factor is the third' and 'an inadequate explanation for delay may, by itself, be sufficient to reject a finding of excusable neglect.'" Palzer, 833 F. App'x at 197 (quoting Perez v. El Tequila, LLC, 847 F.3d 1247, 1253 (10th Cir. 2017)).

Here, the Court concludes that each relevant circumstance weighs against a finding of excusable neglect. First, excusing the Defendants' neglect substantially prejudices Piazza. See 2026 Tr. at 12:4-13 (Johnston)(stating that, if the Court grants the Motion to Reconsider, "that's going to be dispositive of this case," because the total cost of the litigation likely will exceed certain financial limits). The Defendants seek to undo two years of litigation after creating the delay. See 2026 Tr. at 10:14-17 (Johnston)("They want to start [] the case over from scratch[,] do discovery all over again after [] plaintiff and the Court has invested two years."). Granting the Motion to Reconsider delays further resolution of this case; it also compounds the prejudice Piazza already suffers from the loss of wages that the Defendants wrongfully withhold while simultaneously rewarding the delay tactics that produce the present procedural posture. The Court

does not permit the Defendants to benefit from their noncompliance at the expense both of Piazza and the orderly administration of the proceedings.

Second, the length of the delay weighs heavily against the Court finding excusable neglect. Piazza files the MSJ Motion on September 18, 2025, yet the Defendants do not file the Motion to Reconsider until March 2, 2026.  See Motion to Reconsider at 1-2.  That six-month delay understates the scope of the Defendants' neglect, because the Defendants' noncompliance begins much earlier.  The record reflects that Piazza serves discovery requests in January, 2025, which the Defendants ignore.  Properly understood, therefore, the Defendants seek to justify approximately thirteen months of nonparticipation, resulting in costly delay.  In Palzer, the Tenth Circuit affirms a district court's conclusion that no excusable neglect exists where a party files a response "almost three weeks after the twice-extended deadline."  833 F. Supp. at 198.  The delay here far exceeds that timeframe.  Accordingly, the Court determines that the Defendants' lengthy delay and indifference to the orderly administration of the proceedings are inconsistent with excusable neglect.

Third, and most importantly, the Defendants offer no reasonable justification for their delay, and the explanation they provide concerns circumstances largely within their own control. The Defendants contend that they are unable to "respond and fully brief" the MSJ Motion, because Piazza files the motion "during a collapse of Defendants' relationship with their prior attorneys." Motion to Reconsider at 1.  See 2026 Tr. at 5:22-24 (Christina)("The crux of this motion is breakdown in the attorney-client relationship.").  This proffered justification is not persuasive. While the phrase is accurate, the collapse is totally the Defendants' fault and not the fault of the Defendants' counsel.  To blame anything on the Defendants' counsel conflicts with the Court's observations during hearings and throughout the proceedings, as well as with the interactions that

- 37 -

Piazza's counsel had with the Defendants' counsel at the time. The Court knows Mr. Frank T. Apodaca, local counsel, to be exceptionally reliable, a conclusion consistent with Mr. Johnston's experience working with both Mr. Apodaca and Mr. Keval Patel. See 2026 Tr. at 9:7-10 (Johnston)(referring to Mr. Patel: "I always found him through email and telephone to be very responsive to be very competent and very professional"). Moreover, when Mr. Patel files the Emergency Motion to Withdraw, filed October 20, 2025 (Doc. 46)("Emergency Motion to Withdraw"), he does not describe any irreparable breakdown in the attorney-client relationship beyond stating that the Defendants refuse "to provide any information, respond to emails or phone calls regarding this matter." Emergency Motion to Withdraw ¶ 3, at 1. See 2026 Tr. at 9:10-18 (Johnston)("I think the record indicates that the representations that Mr. Patel and Mr. Apodaca made to the court . . . regarding the client going dark and the not cooperating not giving them the information they need to respond to discovery . . . that was entirely consistent with my communication with [] Mr. Patel both over the phone and through email . . . .").

The record reflects the Defendants' refusal to participate in their defense, despite their awareness of the MSJ Motion and the various discovery motions preceding it. See Emergency Motion to Withdraw ¶ 8, at 2 ("Defendants have been informed of the pending motion for partial summary judgment, the pending motion to compel discovery responses and the motion for sanctions against the defendants yet they still have not assisted the undersigned in drafting appropriate responses and defenses."). As the Supreme Court explains, a litigant "voluntarily chose [the] attorney as his representative in the action, and he cannot now avoid the consequences of the acts or omissions of this freely selected agent." Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship, 507 U.S. 380, 397 (1993)(quoting Link v. Wabash R.R. Co., 370 U.S. 626, 633-34 (1962)). The Defendants freely select their counsel and take no meaningful action either to remedy

the alleged communication difficulties or to notify the Court that counsel purportedly lacks authority to proceed on their behalf. Nor do the Defendants alert the Court to any breakdown in communication that might explain their failure to participate meaningfully in discovery or oppose MSJ Motion. Nothing in counsel's conduct before the Court, the Court's observations, or counsels' representations suggests that Mr. Apodoca or Mr. Patel lack authority to act for the Defendants or that the Defendants are unaware of the litigation's progression. Significantly, Piazza files the MSJ Motion approximately five months after filing the first motion to compel, indicating that any deterioration in the attorney-client relationship predates summary judgment proceedings by a substantial period. Yet the Defendants do not raise this alleged breakdown until filing the Motion to Reconsider. While some deterioration in the attorney-client relationship occurs, that circumstance alone does not render the delay reasonable given the Defendants are entirely in control of the situation. Not only are Defendants in control of the situation; the record suggests they manufacture the delay without provocation from their previous counsel.

Finally, the Court concludes that the Defendants act in bad faith. The record does not reflect an isolated communication lapse arising late in the litigation. Rather, it reflects a months-long pattern of noncooperation beginning during discovery in January, 2025, and continuing through the November, 2025, summary judgment proceedings. During that period, the Defendants fail to assist counsel in responding to discovery, fail to participate meaningfully in dispositive motion practice, and ultimately leave counsel unable to prepare substantive responses on their behalf. If the Defendants support the Motion to Reconsider with evidence beyond conclusory assertions regarding a breakdown in communication, the Court might weigh this factor differently. They do not. Instead, the record supports the conclusion that the Motion to Reconsider represents another attempt to delay the proceedings and to avoid liability for the Defendants' willful actions.

The Court therefore concludes that the Defendants' delay is not the product of excusable neglect, but rather part of a deliberate course of conduct that the Defendants design to frustrate Piazza's efforts to obtain compensation the Defendants properly owe her. That conclusion is consistent not only with the procedural history of this litigation, but also with the broader evidentiary record underlying Piazza's labor claims. The evidence demonstrates that the Defendants knowingly classify Piazza as exempt while failing to pay the minimum salary necessary to sustain that classification under the labor laws. See MSJ Motion ¶¶ 13-23, at 4-6. When Piazza invokes her statutory rights, the undisputed facts indicate that the Defendants respond not by remedying the violations, but by demoting her and characterizing her complaints as evidence of a "mental breakdown." MSJ Motion ¶¶ 28-34, at 7-8. The same pattern continues during these proceedings, where the Defendants knowingly decline to engage in discovery, while allowing the litigation to linger. When the Court determines that Piazza is entitled to judgment as a matter of law, the Defendants respond, not by addressing their actions, but by attributing fault to their prior counsel. The undisputed evidence frames the legal issues presently before the Court and informs the Court's determination whether the Defendants' conduct constitutes excusable neglect.

### B. THE RECORD SHOWS THAT THERE IS NO GENUINE ISSUE OF MATERIAL FACT AND THAT PIAZZA IS ENTITLED TO JUDGMENT AS A MATTER OF LAW.

The Court enters judgment in favor of Piazza as a matter of law. A district court may "grant summary judgment if the motion and supporting materials -- including the facts considered undisputed -- show that the movant is entitled to it." Palzer, 833 F. App'x at 200. Here, the Defendants make only one substantive argument that the evidence which Piazza submits creates a genuine issue of material fact. See Motion to Reconsider at 7. The remainder of the Motion to

Reconsider rests largely on the contention that "evidence made part of the record after the Motion was granted demonstrates genuine dispute of material facts," Motion to Reconsider at 7, and that the "legal effect of this new evidence creates a clear indication that the grant of Plaintiff's Motion for partial summary judgment was improvident," Motion to Reconsider at 15.

That argument misunderstands both the case's procedural posture and the consequences of the Defendants' prolonged nonparticipation in the litigation. The Defendants waive their right to controvert Piazza's factual showing when they fail timely to respond to the MSJ Motion. See Reed v. Bennett, 312 F.3d at 1196 ("By failing to file a response within the time specified by the local rule, Reed waived the right to file a response or to controvert the facts asserted in the summary judgment motion."). The Court's summary judgment determination therefore turns on the evidentiary record properly before it at the time Piazza files the MSJ Motion, including the facts the Court deem undisputed under rule 56. The Defendants cannot avoid the consequences of that waiver by attempting, after the Court issues an order, to introduce evidence they previously do not present.

### 1. The Defendants do not Contradict the Evidence that Piazza Submits in the Motion.

Piazza's timesheet does not contradict her statement that "she worked approximately seventy-one (71) hours per week." Motion to Reconsider at 7. The Defendants contend that the "most important proposed fact contradicts itself." Motion to Reconsider at 7. Specifically, the Defendants argue that the timesheet that Piazza submits, reflecting "approximately forty-one (41) hours worked in the week of November 29, 2023," Motion to Reconsider at 7, conflicts with her statement that "she worked seven days a week and averaged approximately 71 hours per week," MSJ Motion ¶ 17, at 5. At first glance, the argument appears plausible. The November, 2023, timesheet that Piazza submits in support of her assertion that the Defendants fail timely to pay her

final wages reflects a workweek of approximately forty-one hours. See Text Messages from Deborah Piazza to Abri Maru at 31 (dated December 22, 2023), filed September 18, 2025 (Doc. 41-1)("Final Wage Demand"). The Defendants' argument, however, dissolves upon closer examination of the record and the Declaration of Deborah Piazza in Support of Plaintiff's Motion for Partial Summary Judgment (executed September 18, 2025), filed September 18, 2025 (Doc. 41-1)("Piazza Decl."), which is competent evidence to support the Motion.

Piazza does not assert that she works seventy-one hours every week. Rather, she states that seventy-one hours represents the "average[] approximat[ion]" of the hours she works each week. MSJ Motion ¶ 17, at 5. Nothing about that statement conflicts with a single forty-one-hour workweek. Merriam-Webster defines "average" as "an estimation of or approximation to an arithmetic mean," average, Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/average. (last visited on May 14, 2026), and defines "arithmetic mean" as "a value that is computed by dividing the sum of a set of terms by the number of terms," arithmetic mean, Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/arithmeticmean. (last visited on May 14, 2026). The Court therefore determines that the relevant set of terms here -- weekly hours worked -- reasonably includes some weeks of approximately forty-one hours and other weeks of substantially greater hours while still yielding an approximate average of seventy-one hours per week. The evidentiary record supports that conclusion. The "Defendants required Plaintiff to be physically present at the hotel from 8:00 a.m. to 5:00 p.m. every day and to remain available on call at all other times." MSJ Motion ¶ 18, at 5. See Hotel Manager Job Requirements and Policies ¶ 17, filed September 18, 2025 (Doc. 41-1)("Job Requirements")("Must be present at work from 8am-5pm every day . . . . Must be available on the weekends . . . . Must be available 24hrs in case of

major emergencies which relates to hotel functionality, staff and guest safety."). Pizza meets these expectations by "remain[ing] available 24 hours a day" and sleeping with her phone at the ready "because calls came at all hours." Piazza Decl. ¶ 7, at 2. In addition to being on call, Piazza "reported to the hotel seven days a week," arriving early and staying late. Piazza Decl. ¶ 8, at 2. Given the Defendants' Job Requirements are consistent with the Piazza Decl., the Court sees nothing unusual or internally inconsistent about Piazza's statement that she averages more than seventy-one hours weekly.

In the face of the internal consistency, the Defendants instead attempt to manufacture a contradiction where none exists. Neither the Final Wage Demand nor the fact that Piazza "only mentions the number of hours worked per week once, and provides no explanation or general accounting of those hours, or her typical schedule" renders the record internally inconsistent. Motion to Reconsider at 7. As the Court explains above, the Defendants' opportunity to dispute Piazza's factual assertions arises with the opportunity to respond to Piazza's motion for partial summary judgment. They do not respond to the factual allegations. Consequently, both the Court and the Defendants must evaluate the MSJ Motion on the factual record that Piazza submits and supports through competent evidence. That record establishes that Piazza "worked seven days a week and averaged approximately 71 hours per week." MSJ Motion ¶ 17, at 5. The Defendants cannot now create a genuine factual dispute by isolating a single workweek from the broader record while ignoring the context that gives the evidence meaning.

### 2. The Defendants Do Not Show a Genuine Issue of Material Fact.

As the Court explains above, the Defendants waive their right to controvert Piazza's factual assertions. Accordingly, the Court considers the arguments that the Defendants now assert to determine whether the evidentiary record properly before the Court nevertheless reveals a genuine

issue of material fact. A genuine issue for trial exists only where sufficient evidence favors the nonmoving party such that a jury could return a verdict in that party's favor. See Am. Soc'y of Home Inspectors, Inc. v. Int'l Ass'n of Certified Home Inspectors, 36 F.4th 1238, 1243-44 (10th Cir. 2022)(stating that there "'is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party'" (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986))). "A fact is 'material' if it 'might affect the outcome of the suit under the governing law.'" Alcala v. Ortega, 128 F.4th 1298, 1306 (10th Cir. 2025)(quoting Anderson v. Liberty Lobby, Inc., 477 U.S. at 248). The Court therefore evaluates whether the Defendants show genuine disputes on the record that Piazza presents; the Court does not reopen the factual record to consider disputes that the Defendants manufacture through evidence they previously decline to present.

The Defendants identify six purported disputes within the record: (i) the Defendants dispute Piazza's duties as General Manager, see Motion to Reconsider ¶ 9, at 8; (ii) the Defendants dispute the number of hours that Piazza works, see Motion to Reconsider at ¶ 17, at 9; id. ¶ 20, at 9; id. ¶ 36, at 11; (iii) the Defendants assert that Piazza misstates the hours which the Defendants require her to work, see Motion to Reconsider ¶ 18, at 9; (iv) the Defendants assert that Piazza misrepresents Patel's comments about her mental health, see Motion to Reconsider ¶ 29, at 10; (v) the Defendants assert that Piazza misrepresents her termination letter, see Motion to Reconsider ¶ 37, at 11; and (vi) the Defendants assert that Piazza misrepresents Patel's statement about obeying directives, see Motion to Reconsider ¶ 41, at 12. None of these arguments show a genuine issue of material fact. Either the evidence remains insufficient for a reasonable jury to return a verdict in the Defendants' favor, the asserted dispute does not affect the outcome under governing law, or both.

- 44 -

First, the Defendants dispute the duties that Piazza performs as General Manager. See Motion to Reconsider ¶ 9, at 8. They rely principally upon the Job Requirements to argue that Piazza qualifies as exempt under the NMMWA. See Motion to Reconsider ¶ 9, at 8. Specifically, they contend that the NMMWA lacks the FLSA's salary-threshold requirement and that the duties which Piazza performs place her outside the statutory definition of employee under § 50-4-21(C)(1). The NMMWA does not specify, however, which party bears the burden of establishing an exemption. See Rivera, 240 F. Supp. 3d at 1155. The Supreme Court of New Mexico looks to FLSA interpretations when construing the NMMWA's analogous provisions, and the Court also looks at FLSA interpretations. See Corman v. JWS of New Mexico, Inc., 356 F. Supp. 3d at 1160. Under the FLSA framework, the employer bears the burden of proving that an exemption applies. See Armijo v. FedEx Ground Package Sys., Inc., 405 F. Supp. 3d 1267, 1274 (D.N.M. 2019)(Brack, J.)(stating that "FedEx bears the burden of proving that Ms. Armijo is exempt from the MWA," and NMMWA exemptions "are strictly and narrowly construed against employers"). The Defendants present no competent evidence sufficient to satisfy that burden.

Indeed, the record before the Court confirms that Piazza does not function as a "supervisor" within § 50-4-21(C)'s meaning. N.M. Stat. Ann. § 504-4-21-(C)(1). Although she carries the title of General Manager, the undisputed evidence demonstrates that her primary duties remain front-line and operational rather than managerial. See MSJ Motion ¶¶ 17-18, at 5. She covers front desk shifts, cleans guest rooms, responds to late-night emergencies, and averages approximately seventy-one hours of work per week. See MSJ Motion ¶¶ 17-18, at 5. Patel retains authority over hiring, firing, and compensation decisions. See MSJ Motion ¶¶ 11-12, at 4. Patel also reassigns Piazza's responsibilities, strips her authority, and ultimately signs her termination letter. See MSJ Motion ¶¶ 28-34, at 7-8. Those facts do not depict a supervisor exercising meaningful managerial

discretion, but an overworked employee whom the Defendants classify as exempt while denying her the protections New Mexico enacts through the NMMWA. Accordingly, even considering the Job Requirements, the Court concludes that the Defendants do not present sufficient evidence from which a reasonable jury could find Piazza exempt under the NMMWA.

Second, the Defendants dispute the number of hours that Piazza works. See Motion to Reconsider ¶ 17, at 9; id. ¶ 20, at 9; id. ¶ 36, at 11. The Court addresses this argument above and briefly reiterates its conclusion here. The Defendants "dispute that Plaintiff worked over forty hours a week during her employment with HK Hospitality." Motion to Reconsider at 15. Both Piazza's testimony, see Declaration of Deborah Piazza in Support of Plaintiff's Motion for Partial Summary Judgment ¶ 16, at 4, taken September 18, 2025, filed September 18, 2025 (Doc. 41-1)("Piazza Decl."), and the Final Wage Demand, see Final Wage Demand at 1, establish that she works more than forty hours per week. Indeed, the Defendants concede that the "time sheet . . . sets forth approximately forty-one (41) hours worked in the week . . . ." Motion to Reconsider at 7. Thus the evidence upon which the Defendants rely confirms overtime work rather than refutes overtime work. The Court consequently concludes that the Defendants do not identify sufficient evidence from which a reasonable jury can conclude that Piazza does not work more than forty hours per week.

Third, the Defendants argue that Piazza misstates the hours that they require her to work. See Motion to Reconsider ¶ 18, at 9. Again, the Court addresses this issue above and limits its discussion here to whether the evidence shows a genuine issue for trial. The Defendants contend that Piazza exaggerates her schedule, because "the job description does not require her to report to work seven days a week every week." Motion to Reconsider ¶ 18, at 9. The Job Requirements, however, undermine rather than support that argument. The evidence establishes that the

Defendants require Piazza to remain physically present at work from 8:00 a.m. until 5:00 p.m. every day of the workweek, remain available on weekends, and remain available twenty-four hours a day in the event of emergencies affecting hotel operations, staff, or guest safety. See Job Requirements ¶ 17, at 1. Piazza's testimony that those expectations result in approximately seventy-one hours of work per week and continuous seven-day availability remains uncontroverted. See MSJ Motion ¶ 17, at 5. Significantly, the Defendants also admit that "HK Hospitality does not have specific time records for her." Motion to Reconsider at 15. The Court therefore concludes that no reasonable jury can rely upon the Job Requirements to find that Piazza does not work seven days per week or regularly exceed forty hours of labor.

Fourth, the Defendants assert that Piazza misrepresents Patel's comments regarding her mental health. See Motion to Reconsider ¶ 29, at 10. They rely upon the WhatsApp Message, arguing that the exchange merely "documents an incident where Plaintiff threw her keys at her direct manager . . . . Patel was frustrated and stated 'that is not acceptable' and '[m]ental breakdowns are not acceptable at this business or the Law.'" Motion to Reconsider ¶ 29, at 10. Even accepting the Defendants' characterization of the incident, the Defendants never explain how the dispute "might affect the outcome of the suit under the governing law." Alcala v. Ortega, 128 F.4th at 1306. The Court agrees that the WhatsApp Message describes a workplace confrontation. See WhatsApp Message at 45. The relevant point, however, is that Patel accuses Piazza of experiencing a "mental breakdown" in a group communication with colleagues after she asserts her workers' rights. The Defendants offer no basis for concluding that this distinction changes the legal analysis or undermines Piazza's broader description of the workplace environment. Accordingly, the Court concludes that this dispute that the Defendants assert neither creates a

- 47 -

material factual issue nor provides sufficient evidence from which a reasonable jury could reject Piazza's characterization of the Defendants' conduct.

Fifth, the Defendants contend that Piazza misrepresents her termination letter. See Motion to Reconsider ¶ 37, at 11. They rely upon the HK Hospitality LLC DBA Quality Inn, Tucumcari Termination Letter, filed September 28, 2025 (Doc. 41-1)("Termination Letter"), and dispute Piazza's assertion that the letter reflects a reassignment of her responsibilities regarding food deliveries. Motion to Reconsider ¶ 37, at 11. The Court understands the Defendants' argument to be that, because the Defendants do not reassign Piazza's duties, she fails to put away a food delivery causing the food to spoil. See Motion to Reconsider ¶ 37, at 11. The Defendants do not explain how this purported factual dispute affects the litigation's outcome. See Motion to Reconsider at 1-23. After reviewing the Termination Letter, the Court finds that the language plausibly supports both Piazza's and the Defendants' interpretation of whether the Defendants reassign the food delivery duties. That circumstance alone, however, does not create a genuine issue for trial. At the time the Court considers the MSJ Motion, Piazza's testimony regarding the meaning and effect of the Termination Letter remains the only admissible evidence properly before the Court on the issue. See Palzer, 833 F. App'x at 200. Accordingly, the Court views the Termination Letter through the lens that Piazza offers, that: "Patel had reassigned [the breakfast delivery] to Robert," and that the WhatsApp messages instruct "staff to call Robert when the delivery arrived." Piazza Decl. ¶ 36, at 8. The Court therefore concludes that no reasonable jury could rely upon the language in the Termination Letter, alone, to reject Piazza's testimony that she is not responsible for the breakfast delivery that spoils.

Finally, the Defendants assert that Piazza misrepresents Patel's statements regarding obedience to supervisory directives. See Motion to Reconsider ¶ 41, at 12. They rely upon the

WhatsApp Message and argue that the "messages referred to only state that Plaintiff needed to obey the directives of her supervisors." Motion to Reconsider ¶ 41, at 12. Piazza, by contrast, asserts that the "record shows Patel had already announced in a group message that Plaintiff was replaced and that she and her family must 'listen' to Maru and his wife." MSJ Motion ¶ 41, at 9 (quoting the WhatsApp Message at 45). After reviewing the WhatsApp Message, the Court concludes that the language plausibly supports both constructions. Yet the mere existence of an alternative interpretation does not itself create a genuine factual dispute sufficient to defeat summary judgment. Once again, Piazza's testimony provides the only admissible evidentiary context properly before the Court when it resolves the MSJ Motion. See Palzer, 833 F. App'x at 200. The Court therefore concludes that the Defendants fail to identify sufficient evidence from which a reasonable jury could conclude that the Defendants do not replace Piazza with Maru.

After reviewing each issue the Defendants raise regarding the evidence supporting the MSJ Motion, the Court concludes that no genuine issue of material fact exists. The Court reaches that conclusion by comparing the Defendants' assertions in the Motion to Reconsider against the evidentiary record Piazza submits in support of the MSJ Motion. Consistent with the procedural posture of this case, the Court does not reopen the record to consider disputes the Defendants attempt to create through evidence they previously decline to present. The purported disputes either fail to provide sufficient evidence from which a reasonable jury could return a verdict for the Defendants, fail to affect the outcome under governing law, or both. Accordingly, the Court concludes that Piazza properly supports the MSJ Motion, that no genuine issue of material fact exists, and that Piazza is entitled to judgment as a matter of law.

## II.    THE NMMWA ENTITLES PIAZZA TO RECOVER DAMAGES FOR EITHER UNPAID OVERTIME OR FOR UNDERPAID MINIMUM WAGE, BUT NOT FOR <u>BOTH</u>.

- 49 -

The Court concludes that the NMMWA permits Piazza to recover either unpaid overtime damages or underpaid minimum wage damages, but not both simultaneously for the same period of employment.  In the Motion, Piazza requests unpaid overtime damages in the amount of "$241,997.70," Motion at 1, and under paid minimum wages in the amount of "$56,823.03," Motion at 2.  In the Response, the Defendants argue that Piazza's calculations result in an improper "double recovery," and urge the Court to award one category of damages or the other, because the DWS "methodology encompasses damages for both the minimum wage and overtime violations." Response at 3-4.  After reviewing the language of the NMMWA and the DWS Investigations Manual Labor Relations Division (published July 30, 2025), filed April 2, 2026 (Doc. 96)("Investigations Manual"), which both parties submit as authoritative, see Response at 4, Reply at 4, the Court agrees that the NMMWA does not entitle Piazza to recover both $241,997.70 in unpaid overtime damages and $56,823.03 in underpaid minimum wage damages arising from the same compensation structure.

The New Mexico Legislature enacts the NMMWA to advance two public polices:

"(1) to establish minimum wage and overtime compensation standards for all workers at levels consistent with their health, efficiency and general well-being, and (2) to safeguard existing minimum wage and overtime compensation standards which are adequate to maintain the health, efficiency and general well-being of workers against the unfair competition of wage and hours standards which do not provide adequate standards of living."

Jim v. CoreCivic of Tennessee, LLC, No. CIV 20-0618 JB/JFR, 2021 WL 4990084, at *20 (D.N.M. Oct. 27, 2021)(Browning, J.)(quoting N N.M. Stat. Ann. § 50-4-19(D)).  To effectuate those policies, the MWA provides:

In addition to penalties provided pursuant to this section, an employer who violates any provision of Section 50-4-22 NMSA 1978 shall be liable to the employees affected in the amount of their unpaid or underpaid minimum wages plus interest, and in an additional amount equal to twice the unpaid or underpaid wages.

N.M. Stat. Ann. § 50-4-26(C).  The statutory text authorizes recovery for "unpaid or underpaid" wages, not for both categories simultaneously for the same hours worked.  N.M. Stat. Ann. § 50-4-26(C).  The Investigations Manual confirms that interpretation, explaining that "the MWA only requires an employer to pay MWA damages for violations of (a) the requirement to pay at least $10.00 per hour . . . or (c) the requirement to pay one and one-half times the regular hourly rate of pay for hours over 40."  Investigations Manual at 48.  The statutory language and the DWS interpretation therefore both support the conclusion that Piazza may recover either unpaid overtime damages or underpaid minimum wage damages, but not both for the same underlying labor.

In the Reply, Piazza contends that "the regular rate for salaried employees is calculated by dividing the weekly salary by forty hours for purposes of determining the overtime premium."  Reply at 3-4.  She further asserts that, for purposes of minimum wage compliance, "compliance is assessed by dividing total weekly compensation by the total number of hours actually worked."  Reply at 4.  Those propositions accurately describe the distinct methodologies that the DWS uses to calculate overtime violations and minimum wage violations independently.  The difficulty arises when Piazza applies both methodologies simultaneously to the same employee over the same time period.

Piazza's own calculations illustrate the inconsistency her approach produces.  For purposes of calculating overtime damages, during the period of November 21, 2021, through April 10, 2022, Piazza derives an hourly rate of "$15.20 per hour," Motion at 5, which results in an overtime rate of "$22.80 per hour," Motion at 6.  For purposes of calculating minimum wage damages, Piazza's methodology produces an effective hourly rate of "$8.56 per hour" for the approximately the same employment period.  Motion at 7-8.  It is unreasonable to conclude that the same employee simultaneously possesses two different regular rates of pay for the same workweek depending

upon which statutory violation the calculation addresses. Such a result distorts rather than implements the NMMWA's remedial framework.

The Investigations Manual addresses this issue through the example involving Javier and Juan. See Investigations Manual at 42. There, the investigator calculates damages for Juan using a single regular rate of pay that remains constant regardless whether the violation involves minimum wages or overtime compensation. See Investigations Manual at 47-48. That approach accords with both the statutory text and common sense. Using one regular rate for the same employee during the same period avoids the internal contradiction that results when two separate hourly rates govern identical labor depending upon the damages theory an employee selects.

The Court concludes that both the NMMWA's text and the DWS's interpretation of the statute support the Defendants' position regarding damages. Piazza therefore may recover either unpaid overtime wages or underpaid minimum wages under the NMMWA, but she may not recover both categories of damages simultaneously for the same underlying hours worked. At the May 11, 2026, pretrial hearing, Piazza elects to receive the higher of the amounts. See Draft Hearing Transcript of Proceedings at 6 (taken May 11, 2026)("May, 2026, Tr.")(Johnston)(stating that Piazza will "choose the unpaid overtime" wages). After trebling the overtime damages, the Court awards Piazza $241,997.70 in unpaid overtime damages. Accordingly, the Court grants in part the Motion, regarding the unpaid overtime damages, and denies in part the Motion, regarding the underpaid minimum wage damages.

## III.     THE COURT AWARDS PIAZZA CONTINUATION WAGES.

The Courd awards Piazza continuation wages for late payment of final wages in the amount of $1,186.80. Section 50-4-4(B) requires employers to pay "discharged employees . . . payment of wages or compensation . . . within ten days of such discharge." N.M. Stat. Ann. § 50-4-4(B).

If an employer fails to pay an employee compensation within ten days, "the wages and compensation of the employee shall continue from the date of discharge until paid at the same rate the employee received at the time of discharge."  N.M. Stat. Ann. § 50-4-4(C).  In the MSJ Order, the Court holds that the Defendants violate § 50-4-4(B).  See MSJ Order ¶ 6, at 1.

The Defendants terminate Piazza's employment on December 6, 2023, see MSJ Motion ¶ 7, at 3, and they do not issue her final paycheck until December 28, 2023, see MSJ Motion ¶ 47, at 10.  Piazza requests that the Court award her "a daily wage rate of $98.90" for the twelve days delays, which results in a continuation wage total of "$1,186.80."  Motion at 10.  The Defendants neither dispute the Court's conclusion that there is a violation of § 50-4-4(B), nor Pizza's calculations either in the Motion to Reconsider, see Motion to Reconsider at 1-22, or in the Response, see Response at 1-7.  Accordingly, the Court awards Piazza continuation wages for late payment of final wages in the amount of $1,186.80.

## IV.    THE COURT AWARDS PIAZZA SEVEN-PERCENT PREJUDMENT INTEREST, BECAUSE THE DEFENDANTS DO NOT MAKE A REASONABLE SETTLEMENT OFFER.

After considering Piazza's conduct during the proceedings and the Defendants' settlement efforts, the Court concludes that seven-percent prejudgment interest on all money judgments the Court enters is appropriate.  The NMMWA provides that "an employer who violates any provision of Section 50-4-22 NMSA 1978 shall be liable to the employees affected in the amount of their unpaid or underpaid minimum wages plus interest, and in an additional amount equal to twice the unpaid or underpaid wages."  N.M. Stat. Ann. § 50-4-26(C).  In addition, a court may, in its discretion, award up to ten-percent prejudgment interest from the date the plaintiff serves the complaint, after considering, "among other things: (1) if the plaintiff was the cause of unreasonable delay in the adjudication of the plaintiff's claims; and (2) if the defendant had previously made a

reasonable and timely offer of settlement to the plaintiff." N.M. Stat. Ann. § 56-8-4(B). As the Supreme Court of New Mexico explains, "Section 56-8-4(B) provides for prejudgment interest from the date of filing of the complaint, not as damages, but as a management tool or penalty to foster settlement and prevent delay in all types of litigation." Sunwest Bank of Albuquerque, N.A. v. Colucci, 1994-NMSC-027, ¶ 21, 117 N.M. 373, 378, 872 P.2d 346, 351. Prejudgment interest also serves a compensatory purpose by making "'the tort victim whole, and has no bearing on the question of punishing the tortfeasor.'" Morga v. Fedex Ground Package Sys., Inc., 2018-NMCA-039, ¶ 49, 420 P.3d 586, 604 (quoting Coates v. Wal-Mart Stores, Inc., 1999-NMSC-013, ¶ 55, 127 N.M. 47, 55, 976 P.2d 999, 1011), aff'd, 2022-NMSC-013, 512 P.3d 774.

Piazza requests a ten-percent prejudgment interest rate. See Motion at 11. She argues that the "statutory factors support application of the maximum ten-percent rate," and notes that courts in the District of New Mexico award the maximum rate where "the employer failed to engage in reasonable settlement conduct." Motion at 11. The Defendants concede that Piazza "did not cause a delay in resolution" of the case. Response at 5. They nevertheless contend that a ten-percent rate is inappropriate, because Piazza allegedly "rel[ies] on punitive factors," Response at 4, and because the Defendants purportedly "acted in good faith to settle" the matter, Response at 5. Piazza responds that the Defendants' offer "was also conditioned on execution of a written release the DOL had not required" and therefore was not reasonable. Reply at 5. She further notes that, during "the more than two years since filing, Defendants have not made a single settlement offer addressing the full scope of Plaintiff's statutory claims." Reply at 6.

The Court agrees with Piazza that the Defendants' settlement conduct does not reflect a reasonable effort to resolve this litigation. The New Mexico Legislature directs courts to consider, "among other things," whether the plaintiff causes unreasonable delay, and whether the defendant

- 54 -

makes a reasonable and timely settlement offer. N.M. Stat. Ann. § 56-8-4(B). Because the Defendants concede that Piazza does not delay the proceedings, the Court focuses on the reasonableness of the Defendants' offer. The Defendants offer Piazza "$9,815.38 in back wages and liquidated damages" under the FLSA. MSJ Motion at 28 n.7. In exchange, Piazza forfeits her New Mexico NMMWA claims, retaliation damages, and prejudgment interest. See Reply at 5. Put differently, the Defendants ask Piazza to relinquish approximately $232,182.32 in damages while accepting a settlement amount representing roughly four percent of the compensation the record demonstrates the Defendants owe her. Even that figure understates the disparity, because the four percent excludes prejudgment interest and additional retaliation damages. The Defendants nevertheless characterize the offer as reasonable.

The Defendants attempt to justify the disparity by arguing that the NMMWA damages rely upon "an allegation that she was working seventy-one hours per week," which the DOL purportedly does not substantiate. Response at 5. The Court declines to speculate about possible factual findings outside the evidentiary record before it. As the Court explains throughout this opinion, the undisputed record establishes that Piazza works approximately seventy-one hours per week on average. See MSJ Motion ¶ 17, at 5. The Court therefore evaluates the reasonableness of the settlement offer against the factual record it admits in the course of this litigation, and not against arguments that the Defendants raise only after declining meaningfully to participate in discovery and summary judgment proceedings. With this context, the Defendants do not make a reasonable settlement offer.

Although both enumerated statutory factors favor Piazza, the Court's analysis does not end there. See N.M. Stat. Ann. § 56-8-4(B) (directing courts to consider "among other things"). Here, those "other things" include the Defendants' conduct throughout the litigation. The Defendants

correctly observe that prejudgment interest exists to make Piazza whole and "has no bearing on the question of punishing the tortfeasor." Response at 4. Their argument, however, conflates punishment for the underlying wage violations with the consequences flowing from their litigation conduct that prolongs resolution of those violations. As the Court explains above, the Defendants repeatedly refuse to cooperate in discovery, ignore written discovery obligations, fail to participate meaningfully in dispositive motion practice, and force Piazza repeatedly to seek Court intervention. See MSJ Motion ¶¶ 53-61, at 11-13. That conduct delays Piazza's recovery of wages that the Defendants wrongfully withhold and undermines the efficient resolution of the proceedings.

To the extent that the Defendants characterize an increased prejudgment interest award as punitive, the Court concludes that a higher rate under these circumstances falls within the purposes which the Supreme Court of New Mexico identifies. See Sunwest Bank of Albuquerque, N.A. v. Colucci, 1994-NMSC-027, ¶ 21, 872 P.2d 346, 351. A meaningful prejudgment interest award compensates Piazza for the extended delay in receiving wages, to which she is entitled, while simultaneously fostering settlement and discouraging litigants from using delay as a strategic tool. The Court also finds significant that the Defendants make no additional settlement offer during more than two years of litigation. See Reply at 6. Although the Defendants emphasize their initial offer, their refusal to engage in settlement discussions after discovery underscores the original proposal's inadequacy, which is a substantial windfall to the Defendants relative to the amount the record demonstrates they owe Piazza.

The Court nevertheless concludes that seven-percent prejudgment interest, rather than the requested ten percent, appropriately balances the statutory considerations. Both parties rely upon Rivera, where the Honorable Carmen E. Garza, United States Magistrate Judge for the District of

New Mexico, awards ten-percent prejudgment interest because the defendant "never made an offer of settlement." 240 F. Supp. 3d 1161. See Motion at 11; Response at 5. As the Defendants correctly note, that circumstance differs from the facts of this case, because they extend a settlement offer. See Response at 5. Rivera also emphasizes, however, that the "[d]efendant was consistently unwilling to participate in a settlement conference and denied willingness to consider settling this case at the pretrial conference . . . ." 240 F. Supp. 3d 1161. The same pattern emerges here. The Defendants fail to participate meaningfully in the proceedings, refuse to cooperate in discovery, ignore written discovery requests, and require Piazza repeatedly to seek judicial intervention. See MSJ Motion ¶¶ 53-61, at 11-13. After considering the parties' arguments, the statutory language and purposes underlying the NMMWA, and the relevant caselaw, the Court concludes that seven-percent prejudgment interest on all money judgments appropriately reflects § 56-8-4(B)'s compensatory and case-management purposes. The Court therefore awards seven-percent prejudgment interest, because the Defendants make one unreasonable settlement offer, fail to engage in further meaningful settlement efforts during two years of litigation, repeatedly delay the proceedings, and Piazza herself does not contribute to that delay.

## V.    THE COURT AWARDS PIAZZA FIFTEEN-PERCENT POST-JUDGMENT INTEREST, BECAUSE THE COURT BASES THE JUDGMENT ON THE DEFENDANTS' BAD FAITH, INTENTIONAL, AND WILLFUL CONDUCT.

The Court awards Piazza fifteen-percent post-judgment interest, because the judgment rests upon the Defendants' bad faith, intentional, and willful conduct. Section 56-8-4(A) provides:

> Interest shall be allowed on judgments and decrees for the payment of money from entry and shall be calculated at the rate of eight and three-fourths percent per year, unless . . . the judgment is based on tortious conduct, bad faith or intentional or willful acts, in which case interest shall be computed at the rate of fifteen percent.

N.M. Stat. Ann. § 56-8-4(A). Piazza argues that the "judgment in this case rests on intentional and willful wage violations, as well as retaliatory and bad-faith conduct." Motion at 13. She further contends that the "record establishes that Defendants classify Plaintiff as exempt from overtime while paying her a salary that did not satisfy the minimum salary level required by law . . . and the Court's liability rulings rested on that misclassification." Motion at 13. The Defendants respond that "the Court did not make a specific finding that HK acted in bad faith, intentionally, or willfully," rendering the enhanced interest rate inappropriate. Response at 6. They maintain that their conduct cannot qualify as bad faith or willful, because they comply with the DOL investigation and later adjust Piazza's salary after the DOL issues its findings. See Response at 6. In the Reply, Piazza identifies three independent reasons supporting the higher rate: (i) the Court enters judgment on "her retaliation claims under both federal and state law"; (ii) the Court awards liquidated damages under the FLSA, which "are mandatory unless the employer proves that it acted in subjective good faith and with objectively reasonable grounds for believing its conduct complied with the law"; and (iii) the "admitted factual record reflects knowing and deliberate conduct." Reply at 7. Piazza therefore argues: "Taken together, the retaliation ruling, the failure to establish good faith under § 260, and the adjudicated wage violations demonstrate that the judgment is grounded in intentional conduct within the meaning of § 56-8-4(A)(2)." Reply at 8. The Court agrees with Piazza. The record reflects bad faith, intentional, and willful conduct even absent the "specific finding" or magic words that the Defendants assert the statute requires. Response at 6. In any case, if a bad faith finding is necessary, the Court now makes clear that it finds the Defendnats engage in bad faith, intentional, and willful conduct.

The Court concludes that the judgment rests upon bad faith, intentional, and willful conduct for three independent reasons: (i) the Defendants retaliate against Piazza after she exercises her

statutory rights, see MSJ Order ¶ 7, at 2; (ii) the Defendants knowingly withhold Piazza's final paycheck, see MSJ Order ¶ 6, at 2; and (iii) the Defendants act culpably with respect to both federal and New Mexico labor laws, see MSJ Order ¶ 12, at 3.  The Court addresses each basis in turn.

First, the Court concludes that the retaliation findings alone strongly support a fifteen-percent post-judgment interest rate.  The Court previously determines that the "Defendants are liable under 29 U.S.C. § 215(a)(3) and N.M. Stat. Ann. § 50-4-26.1 for retaliating against Plaintiff after she asserted her wage rights."  MSJ Order ¶ 7, at 2.  The Court of Appeals of New Mexico explains that § 56-8-4(A) operates as "a guide for a trial court to determine which post-judgment interest rate should apply when the facts show that a defendant acted culpably."  Pub. Serv. Co. of New Mexico v. Diamond D Const. Co., 2001-NMCA-082, ¶ 57, 131 N.M. 100, 117, 33 P.3d 651, 668 ("Diamond D. Construction")(declining to conclude that the "the legislature intended to limit the higher rate to those judgments that include the magic words, 'intentional' or 'willful'" (quoting N.M. Stat. Ann. § 56-8-4(A))).  New Mexico courts interpret "tortious conduct" broadly enough to encompass even negligent conduct lacking intentionality or bad faith.  Sunnyland Farms, Inc. v. Cent. New Mexico Elec. Co-op., Inc., 2013-NMSC-017, ¶ 58, 301 P.3d 387, 403 ("'[T]ortious conduct' includes negligence.'" (quoting Sandoval v. Baker Hughes Oilfield Operations, Inc., 2009-NMCA-095, ¶ 78, 146 N.M. 853, 870, 215 P.3d 791, 810, and citing Diamond D. Construction, 2001-NMCA-082, ¶ 58, 131 N.M. 100, 117, 33 P.3d 651, 668)).  Here, however, the record reflects far more than negligence.  The Defendants retaliate against Piazza after she invokes her statutory rights by stripping her of authority, removing her from her office, reassigning her duties, and forcing her to sit at the front desk.  See MSJ Motion ¶ 28, at 7.  The Defendants then accuse her of experiencing a "mental breakdown."  MSJ Motion ¶ 29, at 7.  When Piazza's counsel informs the Defendants that their conduct violates federal and State labor laws, the Defendants do

not correct their behavior.  See MSJ Motion ¶¶ 31-35, at 8.  Instead, they proceed to terminate her employment.  See MSJ Motion ¶¶ 31-35, at 8.  The Court accepts that the Defendants later cooperate with the DOL investigation and adjust Piazza's salary after the DOL issues its findings.  See Response at 6.  Those later actions do not alter, however, the character of the underlying retaliation or erase the Defendants' culpability once they receive notice that their conduct violates the law.

Second, the Defendants' withholding of Piazza's final paycheck demonstrates intentional and willful conduct.  Diamond D. Construction defines "[w]illful conduct" as "'the intentional doing of an act with knowledge that harm may result.'" 2001-NMCA-082, ¶ 59, 131 N.M. 100, 117, 33 P.3d 651, 668 (quoting the NMRA, Civ. Uniform Jury Instruction ("UJI") 13-1827).  The record satisfies that definition of willfulness.  The Defendants intentionally fail to pay Piazza her final paycheck within the timeframe the statute requires.  See MSJ Order ¶ 6, at 2.  The harm Piazza endures is neither speculative nor unforeseeable.  Piazza explains that the "three-week delay caused serious hardship" for her and her family, which is harm that the Legislature seeks to prevent when it requires prompt payment of earned wages.  MSJ Motion ¶ 47, at 10.  Notably, the Defendants offer no explanation either in the Response or in the Motion to Reconsider why they withhold the paycheck beyond the statutory deadline.  See Response at 1-7; Motion to Reconsider at 1-23.  The absence of any legitimate justification further reinforces the conclusion that the conduct is intentional and willful rather than accidental or administrative in nature.

Finally, the Court concludes that the Defendants' culpability regarding federal and New Mexico labor laws independently supports the fifteen-percent post-judgment interest rate.  New Mexico recognizes "bad faith" both as a cause of action and as a culpable mental state.  Diamond D. Construction, 2001-NMCA-082, ¶ 58, 131 N.M. 100, 117, 33 P.3d 651, 668 (citing NMRA

2001, Civ. UJI 13-1701 to -1718, 13-1827).   In analyzing "bad faith," for purposes of post-judgement interest, two characteristics are important for determining culpability: "(1) the intention of the actor and (2) the degree of knowledge of the possible consequences of an action possessed by the actor at the time of the act."  Diamond D. Construction, 2001-NMCA-082, ¶ 59, 131 N.M. 100, 117, 33 P.3d 651, 668.  Here, it is significant that the Defendants fail to satisfy the FLSA's good-faith exception to liquidated damages.  See MSJ Order ¶ 12, at 3; MSJ Motion ¶ 23, at 6 ("The DOL determined that Defendants owed Plaintiff $9,815.38 in FLSA back wages and liquidated damages.")  Under the FLSA,

> if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act of 1938, as amended, the court may, in its sound discretion, award no liquidated damages.

29 U.S.C. § 260.  The record contains no evidence demonstrating that the Defendants in good faith classify Piazza as exempt or upon objectively reasonable grounds.  See MSJ Order ¶ 12, at 3. Piazza correctly observes: "This was not a close exemption determination.  It did not turn on disputed job duties or an arguable interpretation of regulatory language.  It turned on a binary statutory prerequisite . . . ."  Motion at 13.  The record instead reflects a compensation structure that treats Piazza as exempt while knowingly failing to satisfy the statutory salary threshold necessary to sustain that classification.  This case does not involve a close regulatory question or an isolated payroll mistake.  The admitted evidence shows that the Defendants require Piazza to work approximately seventy-one hours per week while denying her overtime compensation and then retaliating against her after she invokes her statutory rights.  The Defendants later cooperate with the DOL investigation and adjust Piazza's salary, but those corrective measures occur only after the violations come to light and do not alter the underlying conduct's nature.

Looking to the characteristics that <u>Diamond D. Construction</u> identifies, both considerations support a finding of bad faith.  The Court may reasonably infer the Defendants' intention from their inability to demonstrate either a good-faith belief or objectively reasonable grounds for believing their compensation practices comply with federal and New Mexico labor laws.  <u>See</u> MSJ Order ¶ 12, at 3.  The degree of knowledge concerning the consequences of their actions is equally apparent.  During this time, the Defendants control scheduling, compensation, and classification decisions simultaneously, making the consequences of underpayment especially foreseeable.  <u>See</u> MSJ Motion ¶¶11-12, at 4 ("Plaintiff reported directly to Patel, who supervised and controlled her work, determined her pay and exempt status, assigned and removed her responsibilities, and signed her termination letter.").  Requiring an employee to work approximately seventy-one hours per week without lawful compensation predictably creates the economic harm and exploitation that the NMMWA seeks to prevent.  <u>See</u> N.M. Stat. Ann. § 50-4-19(D) (stating that one of the NMMWA's public polices is "to safeguard existing minimum wage and overtime compensation standards which are adequate to maintain the health, efficiency and general well-being of workers against the unfair competition of wage and hours standards which do not provide adequate standards of living").  For these reasons, the Court concludes that the judgment rests upon bad faith, intentional, and willful conduct within the meaning of § 56-8-4(A).  The Court therefore awards Piazza fifteen-percent post-judgment interest from the date of entry of judgment pursuant to N.M. Stat. Ann. § 56-8-4(A).

**IT IS ORDERED** that: (i) the Plaintiff's Motion for Entry of Damages Judgment, filed January 28, 2026 (Doc. 81), is granted in part and denied in part; (ii) the Court awards the Plaintiff unpaid overtime wages in the amount of $241,997.70; (iii) the Court does not award the Plaintiff unpaid minimum wages in the amount of $56,823.03; (iv) the Court awards the Plaintiff

continuation wages for late payment of final wages in the amount of $1,186.80; (v) the Court awards seven-percent prejudgment interest on all money judgments the Court enters; (vi) the Court awards the Plaintiff fifteen-percent post-judgment interest from the date of entry of judgment; (vii) and the Court enters judgment for the Plaintiff and against the Defendants in the amount of $283,358.58.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Rod Johnson
Johnston Law, PLLC
Troy, Michigan

      *Attorneys for the Plaintiff*

Raymond J. Sanguinetti
Rathje Woodward, LLC
Wheaton, Illinois

--and--

Charles J. Vigil
Melissa Marie Christian
Rodey Dickson Sloan Akin & Robb, P.A.
Albuquerque, New Mexico

      *Attorneys for the Defendants*